UNITED STATES of America, Appellee,

v.

Norman RUBINSON et al., Appellants.

Nos. 301, 474, 477 and 478, Dockets 75–1197, 75–1205, 75–1228 and 75–1306.

United States Court of Appeals,
Second Circuit.

Argued Nov. 19, 1975.

Decided April 8, 1976.

Certiorari Denied Oct. 4, 1976.
See 97 S.Ct. 139.

Thomas A. Andrews, New York City (John J. Grimes, and Shea, Gould, Climenko, Kramer & Casey, New York City, on the brief), for appellants Rubinson and Levine.

David V. Keegan, Garden City, N. Y. (McCoyd & Keegan, Garden City, N. Y., on the brief), for appellant Reynolds.

William K. Chester, Miami, Fla., appellant pro se.

Frank H. Wohl, Asst. U. S. Atty., New York City (Thomas J. Cahill, U. S. Atty., Jo Ann Harris, Angus Macbeth, and Lawrence B. Pedowitz, Asst. U. S. Attys., New York City, on the brief), for appellee.

Before MOORE and TIMBERS, Circuit Judges, and COFFRIN, District Judge.*

TIMBERS, Circuit Judge:

Appellants Norman Rubinson, William Chester, Edgar Reynolds and Lawrence Levine [1] appeal from judgments of conviction entered upon jury verdicts returned in the Southern District of New York on March 23, 1975 after an eight week trial before Constance Baker Motley, *District Judge,* finding Rubinson and Levine guilty of conspiring to violate the registration and antifraud provisions of the federal securities laws and the mail and wire fraud statutes in violation of 18 U.S.C. § 371 (1970) (Count 1); [2] and finding Rubinson, Chester and

---

* Hon. Albert W. Coffrin, United States District Judge, District of Vermont, sitting by designation.

1. The twenty count indictment named six defendants in addition to the four appellants. Albert Feiffer was convicted of conspiracy (Count 1), securities fraud (Count 3), and interstate transportation of unregistered securities (Count 14). Feiffer has not appealed. The jury acquitted Jerome Haskell, Walter Wax and Michael Gardner on all counts submitted to the jury as against them. Prior to trial, Sidney Stein pleaded guilty to conspiracy (Count 1), securities fraud (Count 7), and interstate transportation of unregistered securities (Count 14). Philip Kaye prior to trial pleaded guilty to conspiracy (Count 1).

2. As submitted to the jury, the conspiracy count (Count 1) charged a conspiracy to violate Section 17(b) of the Securities Act of 1933, 15 U.S.C. § 77q (1970) (securities fraud); Section

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1975) (securities fraud); the mail fraud statute, 18 U.S.C. § 1341 (1970); the wire fraud statute, 18 U.S.C. § 1343 (1970); and Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e (1970) (interstate transportation of unregistered securities and use of the mails to make illegal public sales).

Section 17(b) of the 1933 Act also was the basis for the substantive securities fraud Counts 2–6; Section 10(b) of the 1934 Act and Rule 10b–5 were the bases for the substantive securities fraud Counts 7 and 8; 18 U.S.C. § 1341 was the basis for the substantive mail fraud Counts 9–13; Section 5 of the 1933 Act was the basis for the substantive interstate transportation of unregistered securities Count 14 and the substantive Counts 15–18 which charged use of the mails to sell unregistered securities; and 18 U.S.C. § 1343 was the basis

Reynolds guilty on a substantive count of interstate transportation of unregistered securities in connection with the sale of the common stock of Stern-Haskell, Inc. in violation of Sections 5 and 24 of the Securities Act of 1933, 15 U.S.C. §§ 77e and 77x (1970) (Count 14).[3]

Among the numerous claims of error raised on appeal, we find the following to be the essential ones: (1) that the conduct with which appellants were charged did not constitute an illegal means of selling unregistered securities; (2) that the evidence was insufficient to support the convictions; (3) that the evidence established multiple conspiracies rather than the single conspiracy charged; (4) that appellants' rights were violated by pre-indictment delay; (5) that Rubinson and Chester were denied their rights to court appointed counsel; and (6) that appellants were prejudiced by the prosecutor's rebuttal summation.

For the reasons below, we affirm the convictions of all appellants on all counts.

## I. FACTS

In view of the issues raised on appeal, including challenges to the sufficiency of the evidence, the following summary of events from late 1968 until mid-1969 is believed necessary to an understanding of our rulings on those issues.

### (A) Overall Conspiracy

■ There was ample evidence from which the jury could find a conspiracy to sell the common stock of Stern-Haskell, Inc. (S–H) to the public without prior registration as required by Section 5 of the Securities Act of 1933. The conspirators caused National Ventures (National), a dummy corporation under their control, to purchase the unregistered stock of S–H and to spin it off as a stock dividend to National's shareholders, most of whom were members of the conspiracy. By laundering the S–H stock through National, the conspirators hoped to claim that they had received the S–H stock as a lawful stock dividend and could sell it legally to the public without registering it. After reacquiring the stock, the conspirators intended to manipulate the market in S–H to drive up the price of the stock and then dump their stock on the public at windfall profits to themselves. The masterminds of the scheme were William Chester, a Florida attorney, and Norman Rubinson, both of whom had had considerable prior experience with similar schemes.[4]

### (B) Stern-Haskell Public Offering

S–H was a small, wholesale used car company which operated out of a large garage in the Bronx. Richard Stern (an unindicted conspirator) was the company's president. Jerome Haskell (a defendant who was acquitted) was its Secretary-Treasurer. During 1967 and 1968 Stern and Haskell rejected the idea of having the company go public because the company could not afford the cost of issuing a prospectus which they knew was necessary for a public offering.

for the substantive wire fraud Counts 19 and 20.

**3.** At the close of the government's case, Judge Motley dismissed Count 20 against Rubinson and Chester. Appellants were acquitted on the other counts, except those stated in the text upon which they were convicted. Rubinson and Chester were named in all 20 counts; Levine in Counts 1–13; and Reynolds in Counts 1 and 14–18.

On May 15, 1975, Judge Motley sentenced Rubinson to concurrent three year terms of imprisonment on Counts 1 and 14; and Chester and Reynolds to three year terms of imprisonment on Count 14, execution of which was suspended, and to three year terms of probation during which Chester and Reynolds are not to engage in any type of stock transaction.

On May 29, 1975, Judge Motley sentenced Levine to an eighteen month term of imprisonment on Count 1, execution of which was suspended, and to a two year term of probation. He also was ordered to pay a $10,000 committed fine within thirty days.

**4.** The government introduced extensive evidence of Chester's involvement in nearly identical spin-offs and public sales of the unregistered stock of two other corporations, as well as evidence of Rubinson's involvement in one of these other schemes.

In late 1968, Haskell began discussing with Chester, Rubinson, Sidney Stein [5] and Albert Feiffer (the latter two being defendants herein) [6] the less costly—but illegal—method of making S–H a public company by "spinning off" its unregistered stock through National.

At this time National was a shell corporation. Its president and chief stockholder was Chester. It was engaged in no business, had no offices other than Chester's home and law office, and had virtually no assets.[7] Chester owned 300,000 of National's 400,000 outstanding shares. Marinus Laboratories, a small company with which appellant Reynolds was associated, owned 24,000 shares of National. Reynolds' parents owned several hundred shares of National. Some of the National shares owned by Marinus and Reynolds' parents had been acquired from Chester in return for Reynolds' assistance in helping Chester obtain control of National.

As plans coalesced for the illegal sale of unregistered stock of S–H and several other companies, Chester began giving away ten-share certificates of National stock to friends and relatives so that the phony spin-offs would appear to be lawful stock dividends of a bona fide corporation. In this manner Chester increased the number of National shareholders from 100 to more than 800.

Chester and Rubinson also organized what they called the Stock Transfer Agency. This was a sole proprietorship in the name of one Nordin, Chester's law clerk. Its function was to act as the transfer agent for several of Rubinson's companies, as well as for National, S–H and other companies whose unregistered shares were to be illegally spun off and sold to the public.

On February 8, 1969, Chester, Rubinson, Feiffer, Stein, Haskell, Saul Weitzman and Louis Hochen (the latter two being unindicted conspirators) met with others at the offices of Weitzman's furniture company in Miami. There they agreed to effect a public offering of S–H stock by transferring 200,000 of its shares [8] to National which in turn would distribute those shares to National's stockholders as a liquidating dividend. Weitzman, Hochen, Feiffer and one Harry Silber were designated as nominees of Rubinson, Stein and Feiffer to hold National shares and later the S–H shares as a stock dividend. It also was agreed that each nominee, as payment for the use of his name, would receive 2,000 shares of S–H stock. Rubinson, Stein and Feiffer agreed to advance Weitzman enough money to purchase 37,500 shares of National in his own name. At the same meeting, Stein announced that he would arrange to drive up the price of S–H to about $5 per share on the public market.

In February 1969, Rubinson took Stern and Haskell to an attorney to obtain an opinion about the legality of the proposed transaction. The attorney selected was one Rubinson previously had described as a good attorney who "would go out on a limb" to render a helpful opinion for Rubinson's benefit. On the basis of false and misleading information furnished by Chester,[9] the attorney gave Rubinson, Chester,

---

5. By 1968 Stein had been indicted two or three times for violations of the securities laws.

6. Rubinson, Stein and Feiffer were financial consultants and investors. They lived in Florida, but commuted to New York each week where they worked out of Stein's apartment. While in New York they shared a limousine.

7. As the corporation's major asset Chester listed a tract of land in Peru which had been confiscated by the Peruvian government. Chester sold the land to National in return for 345,000 shares of National stock. This made him the majority stockholder.

8. S–H had been recapitalized to increase its authorized and outstanding shares to 1,000,000.

9. Chester sent the attorney a certificate which stated that National had 794 stockholders, owned 34,500 acres of unimproved land in Peru, and held investments in other publicly traded corporations. Chester, however, did not disclose that almost all of the National stockholders held only small amounts of stock which had been given to them by Chester; or that Chester and his close associates held most of the National stock; or that the land in Peru which Chester had sold to National had been confiscated by the Peruvian government; or

Stern and Haskell a 15 page opinion letter which stated, among other things, that the law was unclear with respect to the sale of unregistered securities by persons who had received them as a stock dividend *in good faith,* and *who had no control* over the company which paid the dividend. The opinion letter, however, stated clearly and unequivocally that shareholders who controlled the company which paid the dividend could not sell such unregistered securities and that spin-offs which were used merely to evade the registration requirements of the statute were illegal.[10]

In March 1969, Chester and Stern executed an agreement which provided that National would purchase 200,000 shares of S–H stock for $5,000 and that National then would distribute the S–H stock to its stockholders as a stock dividend. On March 7, 1969, Chester sent to S–H a $5,000 National check in payment for the 200,000 shares. Six days later, however, S–H paid $5,000 to Chester purportedly as an attorney's fee.[11]

On the same day that Chester sent National's $5,000 check to S–H, Chester announced to National's stockholders a 100% liquidating dividend of the 200,000 shares of S–H owned by National.

By this time, of the total of 400,000 outstanding shares of National, more than seventy-five per cent was held by Chester and his close associates or nominees. Chester had transferred 37,500 shares of his National stock to each of Weitzman, Hochen, Silber and one Andrew McKay, and 34,000 shares to Feiffer; all held the stock as nominees. Chester retained 116,000 shares. Feiffer also had acquired 5,000 shares from Marinus Laboratories which itself owned 24,642 shares. Small amounts of National stock also were owned by Chester's ex-wife, Reynolds' parents and one of Reynolds' business associates.

Accordingly, the distribution which Chester arranged on April 11, 1969 to National's stockholders of a dividend of one share of S–H for every two shares of National which they held resulted in transfers primarily to appellants, their nominees and associates.

In the meantime, Rubinson, Stein and Feiffer had arranged with appellant Levine to have the S–H shares traded publicly through Lockwood & Company, a New York brokerage firm where Levine was the head trader. Levine and Stein agreed that Lockwood would act as market maker for the S–H stock, purchasing it from Stein, Rubinson and Feiffer (who had all the nominee stock) and selling it to investors through other brokerage firms.[12] Lockwood was to be paid about $1 per share for its services, with slight adjustments if the stock should sell appreciably above or below $4 per share. Stein assured Levine that he and his associates had control of the S–H market and would not allow the market to

that, although the certificate purportedly was signed by Nordin, actually Chester had forged his signature.

**10.** The opinion letter stated among other things:

"In view of the foregoing and of the expressed opinion of the Commission, the entire transaction, including all of the intermediate steps may not be a pre-existing plan or device to avoid registration and to, absent such protective device, distribute large blocks of stock to the general public.

\* \* \*

Conclusion: It is the opinion of the Undersigned, that the transaction whereby National [Ventures] purchases shares of Stern [-Haskell] is exempt pursuant to Section 4(2) of the Act; the distribution of the Stern [-Haskell] shares as a dividend to National [Ventures] shareholders is an exempt trans-

action in accordance with the Commission view thereon and the 'no sale' theory; the Stern [-Haskell] shares in the hands of the 'non-control' National [Ventures] shareholders are 'free trading' in the absence of a plan or scheme to utilize such shareholders as a conduit for distribution in evasion of the Registration requirements of the Act. . . . ."

**11.** National's $5,000 check to S–H was returned for insufficient funds. After receiving his "attorney's fee" from S–H, Chester deposited $3,500 in National's account so that when S–H redeposited National's check it cleared.

**12.** Stein, Rubinson and Feiffer agreed to sell their S–H stock to Lockwood through New York Stock Exchange member firms rather than directly. They agreed to sell the stock in small blocks so that brokers would not ask whether the stock constituted a control block.

become diluted so as to impede efforts to drive up the price. Stein, Rubinson and Feiffer also agreed to help Levine to stimulate buying of S–H stock.

During this same period, Chester instructed Nordin at the Stock Transfer Agency in Florida to issue the nominees' shares of the S–H stock dividend in Lockwood's name. Chester also told Nordin to issue the stock in 100-share certificates so that it could be easily marketed. Chester and Rubinson also instructed Nordin to issue 350,000 additional shares of S–H stock in 1,000-share certificates in Lockwood's name; but the ultimate disposition of these shares is unclear from the record.

During May and June 1969, the S–H stock owned by Rubinson, Stein and Feiffer was sold to Lockwood through three New York Stock Exchange member firms at prices ranging from $3¾ to $4⅜ per share. The market price of S–H rose from $1 per share in mid-April 1969 to $4⅜ in June 1969. In accordance with their arrangements, Levine would inform Stein, Rubinson or Feiffer when he had found a buyer for the stock. Stein, Rubinson or Feiffer then would sell enough shares to Lockwood to cover Levine's buy order. Levine in turn would receive his cash payoff several days later.

To stimulate investor demand for the S–H stock, Levine hired defendant Philip Kaye to tout the stock.[13] Kaye was paid approximately $1,500 to $2,000 for his services.[14]

Despite some "back-door" selling of S–H stock by Chester,[15] Levine and his associates managed to drive up the price of S–H to approximately $4⅜ in June 1969.

(C) *Similar Chester-engineered Public Offerings*

The government also adduced evidence from which the jury could find that the S–H spin-off was but one of a number of similar ventures engineered by Chester.

In April 1969, Chester agreed through National to spin off to the public the unregistered stock in Mobile Home Ventures.[16] National paid $2,000 for 200,000 Mobile Home shares. Chester again received an "attorney's fee" from Mobile Home in the same amount ($2,000). Although Chester caused National to declare the stock dividend, the Mobile Home stock never was sold to the public, largely because Stein, Rubinson and Feiffer refused to develop a market for the stock.

In April or May 1969, Chester also arranged with the owner and general manager of Diston Industries, a shower door manufacturer, to transform Diston into a public company by spinning off to the public its unregistered stock through National. The Diston stock was sold to National; Chester received an "attorney's fee" in the same amount as National's payment for the

---

**13.** At one point Kaye went to Stein's apartment where he picked up one of the payments from Rubinson to Levine.

**14.** Chester and Reynolds came to New York in June 1969 to sell 18,500 shares of Reynolds' S–H stock to B'Noth Jerusalem, a charitable organization. The stock was sold at less than one-third of the market price. B'Noth Jerusalem previously had acted as a nominee for Stein. The organization paid Reynolds. The next day Chester deposited $10,000 cash in his bank account, listed as a "loan from Ed Reynolds."

**15.** After Levine complained to Stein that somebody was diluting the market by selling S–H stock, Stein and Rubinson discovered that the culprit was Chester.

Weitzman later tried to sell some of his S–H stock which already had been placed in Lockwood's name. At first Rubinson denied Weitzman permission. Later Rubinson and Stein bought some of Weitzman's stock themselves and allowed him to sell the rest of his shares on the market.

**16.** At the request of the owners of Mobile Home Ventures, Chester obtained an opinion letter from a Washington, D.C. securities lawyer. The opinion letter clearly and at length warned Chester that recipients of unregistered stock through a stock dividend could sell such stock to the public only if they were not officers, directors, 10% stockholders or persons in control of the corporation which paid the stock dividend, and only if the spin-off was not part of a scheme to profit from the sale of unregistered stock while circumventing the registration requirements of the Securities Act of 1933.

**958**

stock; and the Diston stock dividend was declared by National. Chester, Stein, Rubinson, Feiffer and their associates received most of the Diston stock and transferred it to B'Noth Jerusalem as nominee.

The government also introduced Chester's testimony in a prior proceeding in which he admitted at some length that he knew he could not legally sell his restricted stock to the public because he was a "control person" of National.

## II. ILLEGALITY OF SPIN–OFF SALE

Appellants claim that, upon their assertion that the legality of selling unregistered securities received as a stock dividend was unsettled at the time of the S–H spin-off, they were convicted on the basis of a retroactive interpretation of Sections 4 and 5 of the Securities Act of 1933 [17] and therefore were denied due process. Upon the facts of

17. The provisions here involved of the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa (1970), are the following:

 Section 2(3) ........ 15 U.S.C. § 77b(3)
 Section 2(11) ....... 15 U.S.C. § 77b(11)
 Section 4(1) ........ 15 U.S.C. § 77d(1)
 Section 4(2) ........ 15 U.S.C. § 77d(2)
 Section 5 .......... 15 U.S.C. § 77(e)
 Section 15 ......... 15 U.S.C. § 77(o)

18. Appellants rely on *SEC v. Harwyn Industries Corp.*, 326 F.Supp. 943, 954 (S.D.N.Y. 1971), in support of their claim that the illegality of spin-off sales only recently has been established. That opinion makes it clear that the issue there, and the references by Judge Mansfield to earlier uncertainty about the legality of spin-offs, bear no relation whatsoever to the issue here involved. In *Harwyn,* the issue was whether a corporation which paid a stock dividend had made a "disposition [of the unregistered securities] . . . *for value*" within the meaning of Section 2(3) (emphasis added). Obviously the question whether a corporation's dividend payment of unregistered stock was "for value" and therefore was an illegal distribution is not the same as the question whether stockholders who receive the dividend stock legally may sell it to the public.

 Whatever doubt may have existed at an earlier time as to what constituted "value" received by the corporation which made the distribution, there never was any doubt that shareholders who controlled the corporation which paid

the instant case, we hold that this claim is wholly without merit.

Section 5 prohibits the use of any means of interstate transportation or communication to sell unregistered securities. Section 2(3) defines "sale" as "every contract of sale or disposition of a security . . . for value." Sections 4(1) and (2), respectively, exempt from the prohibitions of Section 5 "transactions by any person other than an insurer, underwriter, or dealer" and "transactions by an issuer not involving any public offering."

We may assume, without deciding, that, where a corporation has declared a bona fide dividend in unregistered securities, stockholders who neither control the corporation which declared the dividend, see Sections 2(11) and 15, nor act in concert with persons who do have such control, come within the exemption provided by Section 4(1) and, as innocent stockholders, may sell the unregistered stock they have received.[18]

the dividend could not sell legally to the public unregistered securities which they had received. Nor has there ever been any doubt that a corporation such as National and persons in control of such a corporation in spinning off the unregistered stock of another corporation such as S–H pursuant to an agreement with the latter are issuers or underwriters within the meaning of Section 5.

In *Harwyn,* there was no claim that the recipients of the stock dividend were persons in control of the corporation which paid the dividend. The only question was whether the dividend payment in unregistered stock of a corporation's subsidiary in itself was an illegal distribution since the dividend was paid pursuant to an agreement with an unaffiliated corporation. Indeed, the court held that both the corporation which paid the dividend and the unaffiliated corporation received value—in the form of indirect benefits resulting from the creation of a public market in the stock of the subsidiary and other consideration which was part of the agreement pursuant to which the dividend was paid—even though the stockholders did not pay directly for the stock distributed to them.

In view of the massive, albeit misplaced, reliance by appellants on *Harwyn,* it is noteworthy that the essential holding by Judge Mansfield was in accordance with the remedial purpose of the 1933 Act in interpreting it "to provide adequate disclosure to members of the investing public, rather than engage in strangulating literalism." 326 F.Supp. at 954, and cases there cited. See also *SEC v. Datronics Engineers, Inc.,* 490 F.2d 250, 254 (4 Cir. 1973),

The instant case, however, is a far cry from the assumed facts just stated. Here the unregistered securities were issued to and sold by persons who were in complete control of the corporation that declared the stock dividend. Indeed, the conspirators used their control to cause National to pay the stock dividend as a 100% liquidating dividend to its stockholders—most of whom were conspirators themselves—pursuant to an arrangement with S–H and purposely to circumvent the registration requirements of the 1933 Act.[19] Chester and his associates had been warned by counsel that their scheme was illegal.

We hold that at the time the conspirators laundered the S–H stock through National there was no conceivable basis for a good faith belief that their scheme was legal.[20]

### III. SUFFICIENCY OF THE EVIDENCE

Appellants also claim that, even if the illegality of their scheme was not open to question, the government failed to prove in support of the conspiracy count that appellants knew they were required to register the S–H stock which they received as a dividend before selling it. Reynolds claims that the evidence was insufficient to establish the essential elements to support his conviction on substantive Count 14. We hold that these claims are without merit.

In order to establish the essential elements of knowledge and willfulness under the conspiracy count, the government was required to prove either that appellants knew, or that they deliberately closed their eyes to, the necessity for registering the S–H stock before selling it. *United States v. Benjamin,* 328 F.2d 854, 861–63 (2 Cir.), *cert. denied,* 377 U.S. 953 (1964). The court clearly charged that, before appellants could be convicted on the conspiracy count, the jury must find that they knew, or deliberately tried to avoid knowing, that the spin-off did not exempt the securities from the registration requirements of the statute. Our careful examination of the voluminous record satisfies us that the jury's verdict as to each appellant was supported by overwhelming evidence of their knowledge and willfulness, including evidence of furtive and roundabout dealings; evidence that two different lawyers had warned Chester and Rubinson that the spin-off sales would be illegal;[21] evidence that appellants laundered their stock through National solely to circumvent the registration requirements; evidence that appellants were sufficiently familiar with those requirements to alert them to the illegality of their scheme; evidence that appellants used nominees to conceal the fact that National's stock dividends were going to control persons; and evidence that the persons who arranged for the spin-off of S–H stock were the same ones who received and sold that stock.

Our examination of the record also satisfies us that there was ample evidence from which the jury could find that Reynolds transported the unregistered S–H stock in interstate commerce for the purpose of selling such stock as charged in

---

*cert. denied,* 416 U.S. 937 (1974). This remedial purpose of the statute was correctly emphasized in both *Harwyn* and *Datronics* in the context of evaluating the "value" a corporation may receive by paying out dividends in unregistered securities and of the illegality of such distributions without complying with the registration provisions of the statute.

19. Judge Motley correctly charged the jury that the sale of the unregistered S–H stock might have been illegal under either of two theories: (1) that defendants were "control" persons of National which could be considered an issuer or underwriter; or (2) that defendants themselves were underwriters for S–H as the issuer,

having agreed with S–H to distribute that corporation's stock publicly. Section 4(1).

20. For the reasons stated above, there also is no doubt that National's stock dividend, declared pursuant to an arrangement with S–H itself, was a public offering. Moreover the conspirators' own sales to the public constituted a public offering. Hence the exemption provided by Section 4(2) clearly was inapplicable.

21. Indeed, Chester admitted in prior proceedings that he knew that as a control person of National he could not legally sell his restricted stock to the public. See, p. 958 *supra.*

Count 14. *United States v. Bertolotti*, 529 F.2d 149, 155 (2 Cir. 1975); *United States v. Finkelstein*, 526 F.2d 517, 526 (2 Cir. 1975). Although Reynolds was acquitted on the conspiracy count, there was substantial evidence that in June 1969 he and Chester travelled from Florida to New York where they sold to B'Noth Jerusalem 18,500 shares of S–H stock which was in Reynolds' name and which had been brought from Florida. There also was evidence that Reynolds had helped Chester in obtaining control of National; that in return for this help Chester had transferred significant amounts of S–H stock to Reynolds' family and to Marinus Laboratories, a corporation controlled by Reynolds and of which he was an officer; and that Reynolds had transferred some of the stock of Marinus Laboratories to Feiffer. Reynolds' acquittal on the conspiracy count is not inconsistent with his conviction for illegally selling his own unregistered S–H stock dividend on the ground that he was acting in concert with Chester whom he knew to be a control person or an underwriter. The jury consistently could have found that Reynolds did not understand the scope of the conspiracy but have found that he knew Chester controlled National or had effected the spin-off pursuant to an agreement with S–H.[22]

## IV. SINGLE CONSPIRACY

Rubinson and Levine claim that the evidence established multiple conspiracies rather than the single conspiracy charged.

We need not tarry on this claim in view of the well settled law on the subject in this Circuit as the result of our many recent decisions which have discussed it in depth. E.g., *United States v. Sperling*, 506 F.2d 1323, 1340 (2 Cir. 1974), *cert. denied*, 420 U.S. 962 (1975); *United States v. Bynum*, 485 F.2d 490, 495–97 (2 Cir. 1973) *vacated and remanded on other grounds*, 417 U.S. 903 (1974); *United States v. Agueci*, 310 F.2d 817, 826–28 (2 Cir. 1962), *cert. denied*, 372 U.S. 959 (1963).

 Here the evidence clearly established a single overall conspiracy of which the spin-off was the first phase and the sale of the stock the second. The very purpose of the spin-off was to set up the subsequent sale and to conceal the fact that the conspirators could not sell the stock legally without registering it. The fact that the spin-off was effected in Florida and the sales in New York is irrelevant.

Likewise it is of no significance that Levine did not personally know all of the other conspirators. He knew the scope of the conspiracy; he knew that persons with whom he did not deal directly necessarily were involved; and he had a substantial stake in the success of the scheme. More than that is not required.

Given the nature of an illegal spin-off sale to defeat the registration requirements of the federal securities laws, we cannot think of a clearer case of a single conspiracy than the one here charged and proven.

## V. PRE–INDICTMENT DELAY

Rubinson and Levine claim that the government intentionally delayed having an indictment returned against them for more than two and one-half years, and possibly as long as four years, solely to obtain the benefit of the SEC's investigation and enforcement action involving the S–H spin-off.[23] They assert that they were prejudiced by having to disclose information in the civil proceedings that later was used against them in the criminal prosecution and by the inability of witnesses at trial to recall certain dates.

---

**22.** The other appellants do not challenge the sufficiency of the evidence to establish the elements of the crimes of which they were convicted, with the exception of the element of willfulness. We hold that the evidence, much of which is summarized above, overwhelmingly supported each count upon which each appellant was convicted.

We reject as frivolous Chester's claim that his acquittal on the conspiracy count was inconsistent with his conviction on Count 14.

**23.** *SEC v. Stern-Haskell, Inc.*, 70 Civ. 4065 (S.D.N.Y., filed Sept. 18, 1970).

As for the claim that they were prejudiced by the prior civil proceedings, the only basis for such a claim is that they somehow were coerced into disclosing information which they would have refused to disclose by invoking their Fifth Amendment privilege against self-incrimination if they had known that they were going to be prosecuted later. To the extent that they did invoke their Fifth Amendment privilege during the civil proceedings, they received the full protection afforded by the privilege. Since they likewise could have invoked the same privilege in response to a demand for any other information in the civil proceedings, they cannot rely upon what information they did disclose to establish prejudice. *Garner v. United States,* 424 U.S. 648 (1976); *United States v. Kordel,* 397 U.S. 1, 10 (1970); *United States v. Parrot,* 425 F.2d 972, 976 (2 Cir.), *cert. denied,* 400 U.S. 824 (1970). While we recognize that "the Government may not use evidence against a defendant in a criminal case which has been coerced from him under penalty of either giving the evidence or suffering a forfeiture of his property," *United States v. Kordel, supra,* 397 U.S. at 13,[24] we cannot assume that this was the unusual case where the judge who presided over the civil proceedings would have allowed appellants' invocation of their Fifth Amendment privilege to affect their substantial interests. Moreover, to the extent the privilege was not asserted in the prior proceedings, there is no way of establishing as to which questions appellants would have invoked their privilege. *Garner v. United States, supra,* 424 U.S. at 656.[25] As the Supreme Court held in *United States v. Kordel, supra,* 397 U.S. at 11, "it would stultify enforcement of federal law to require a governmental agency . . . invariably to choose either to forego recommendation of a criminal prosecution once it seeks civil relief, or defer civil proceedings pending the ultimate outcome of the criminal trial."

As for the claim that Rubinson and Levine were prejudiced by the inability of witnesses to remember certain dates, we hold that they have demonstrated neither improper delay nor substantial prejudice. *United States v. Marion,* 404 U.S. 307, 324 (1971); *United States v. Frank,* 520 F.2d 1287, 1292 (2 Cir. 1975); *United States v. Brown,* 511 F.2d 920, 922–23 (2 Cir. 1975); *United States v. Ferrara,* 458 F.2d 868, 875 (2 Cir.), *cert. denied,* 408 U.S. 931 (1972).

If there was any intentional delay in returning the instant indictment, it was due in significant measure to the refusal of critical witnesses until 1973 to reveal what they knew. As we said in *United States v. Feinberg,* 383 F.2d 60, 64–65 (2 Cir. 1967), *cert. denied,* 389 U.S. 1044 (1968), "Time consuming investigation prior to an arrest minimizes the likelihood of accusing innocent parties and may facilitate the exposure of additional guilty persons." See also *United States v. DeMasi,* 445 F.2d 251, 255 (2 Cir.), *cert. denied,* 404 U.S. 882 (1971). Furthermore, "Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." *Hoffa v. United States,* 385 U.S. 293, 310 (1966), quoted in *United States v. Marion, supra,* 404 U.S. at 325 n. 18.[26]

24. See also *Gardner v. Broderick,* 392 U.S. 273 (1968); *Garrity v. New Jersey,* 385 U.S. 493 (1967).

25. As the Supreme Court stated in *Garner:* "Unless a witness objects a government ordinarily may assume that its compulsory processes are not eliciting testimony that he deems to be incriminating. Only the witness knows whether the apparently innocent disclosure sought may incriminate him, and the burden appropriately lies with him to make a timely assertion of the privilege. If, instead, he discloses the information sought, any incriminations properly are viewed as not compelled." 424 U.S. at 655.

26. Appellants point to lapses of memory by the *government's* trial witnesses. We are satisfied that such lapses did not prevent appellants from effectively cross-examining them.

Moreover, some of the defendants in the instant case were alerted to the possibility of criminal prosecution as early as 1969 when they were informed of their rights during the

We reject the claim of prejudicial pre-indictment delay as being wholly without merit.

## VI. RIGHT TO COUNSEL

After making repeated unsuccessful demands for the appointment of counsel on the ground of indigency, Rubinson and Chester proceeded to trial *pro se*. On appeal [27] they claim that the district court was clearly erroneous in finding that they could afford their own counsel. They argue that they were denied their right to counsel under the Sixth Amendment and to due process under the Fifth Amendment. We disagree.

### (A) *Rubinson*

At the first pre-trial conference before Judge Motley on June 27, 1974, Rubinson appeared without counsel. He informed the court that his attorney was in Europe, but that he wanted to handle his own defense. He requested a stay of his sentence on another conviction so. that he could prepare his own defense.[28] This request was denied. Judge Motley warned Rubinson that the instant case would be complicated. She strongly urged him to get an attorney. The trial was ordered to begin January 14, 1975. Pre-trial motions were to be filed by September 1, 1974.

Five months later, at the next pre-trial conference before Judge Motley on December 5 and 6, 1974, Rubinson again appeared without counsel. He informed the court that he had changed his mind about representing himself and now wanted the court to appoint counsel for him. He stated that the case now appeared too complicated for him to handle himself and that his incarceration had prevented him from preparing his case. After only a short interrogation of Rubinson about his financial status, Judge Motley agreed to appoint counsel for him provided that he filed the affidavits regarding his financial status which were required by the Criminal Justice Act.

During the course of the December 5 pre-trial conference, Judge Motley appointed successively two lawyers to represent Rubinson, each of whom informed the court that he could not undertake his defense.[29] The government then directed the court's attention to the transcript of the June 27 pre-trial conference where, according to the government, Rubinson had waived his right to counsel. Judge Motley then ruled that Rubinson indeed had waived his right to counsel at that time. She further ruled that, since he had failed to move for appointment of counsel until December 5, although pre-trial motions were to have been filed by September 1, such delay confirmed his earlier waiver of his right to counsel.

Despite this ruling, Judge Motley held a hearing on December 20, 1974 on the question of Rubinson's financial ability to retain counsel. The government informed the court that Rubinson lived in a large house in a wealthy community, shared a Rolls Royce and Maserati with his son, had substantial interests in a number of corporations, had held a position as president of one corporation for 29 years, and had secreted his own wealth with that of his wife, his son, his mother-in-law and his father-in-law. The government also directed the court's attention to a decision by Judge Tenney in another case [30] where the court had found that Rubinson had created certain corporations to permit him to avoid

SEC investigation. Such warnings, together with the likelihood that defendants would have preserved their evidence for the civil proceedings, effectively undercut any claims that defendants were prejudiced by the delay. *United States v. Feinberg,* 383 F.2d 60, 66 (2 Cir. 1967), *cert. denied,* 389 U.S. 1044 (1968).

27. Rubinson was represented by retained counsel on the instant appeal; Chester argued his appeal *pro se* and filed a brief *pro se*.

28. Rubinson was incarcerated from August 5 to October 10, 1974. For approximately three months thereafter he was in a Florida halfway house.

29. At the December 5 pre-trial conference, Rubinson stated, "If Your Honor so rules, I will represent myself."

30. *SEC v. Radio Hill Mines Co.,* 70 Civ. 3286 (S.D.N.Y., filed Feb. 20, 1969).

disclosing his assets to his creditors and where the court had ordered an examination of Rubinson's financial affairs.

At the time of the December 20 hearing, Rubinson still had not filed the affidavits regarding his financial status required by the Criminal Justice Act which Judge Motley two weeks earlier had directed him to file. In response to questions by the court as to whether he had received any income from any source during the past ten months, Rubinson, although under oath, repeatedly hedged in his answers, stating that he did not "believe" so. After being admonished by the court, Rubinson stated that he had not received any income during the past twelve months. He said that he had been living on loans from his mother-in-law and his father-in-law who lived with him, his wife and his daughter; also that he had lived on loans from his son for at least two or three years. He said that he could not remember how much money he had borrowed, but from his son he had borrowed "enough to live on". He admitted that, together with his father-in-law, he ran an electronics company for 29 years as a director and as president.

Finally, based on Rubinson's reluctant admission that he owned a house on Hibiscus Island in Miami Beach, Florida, which had been built in 1950 for $20,000 and on which he had obtained a $40,000 mortgage in 1973, the court found that the house had a present value of $80,000 to $100,000 in which Rubinson had a substantial equity after taking into account the mortgage. Accordingly, *relying solely on Rubinson's own testimony regarding the value of his house,* the court concluded that he was financially able to retain counsel and was not entitled to court appointed counsel pursuant to the Criminal Justice Act.

The correctness of this ruling was confirmed by subsequent events. During the first ten days of the eight week trial, Rubinson and his wife stayed in a $52 a day suite at the Park Lane Hotel in New York. During the remainder of the trial, they lived in $775 a month accommodations at the Town House in New York. Rubinson made several weekend trips to Florida during the trial.[31] After his conviction and by the time of sentencing, Rubinson was represented by retained counsel, as he has been throughout the remaining proceedings to date, including the instant appeal. Upon hearing of a $10,000 cash bond requirement as a condition to his release pending appeal (in addition to posting the deed to his Hibiscus Island house), Rubinson was able to obtain a $10,000 check for his bail with a quick telephone call from the magistrate's office to his mother-in-law in Florida.[32] Also at the hearing on his application for bail pending appeal, Rubinson informed the court that "without me, your Honor, they [his relatives] were like destitute".

On this record, it is unnecessary for us to reach the question whether Rubinson waived his right to counsel by failing to move for court appointed counsel until the December 5 pre-trial conference—more than five months after the initial pre-trial conference at which he informed the court that he wanted to handle his own defense.[33]

---

**31.** During the period he was pleading with the district court for appointment of counsel, Rubinson informed the court that he could come to New York from Florida to confer with counsel "whenever it is necessary for me to come up."

**32.** At the hearing held on May 16, 1975 on Rubinson's application for bail pending appeal, it was disclosed that he was employed by a company in Florida which was paying him $1200 a month and also was paying his attorney's fees on appeal. Rubinson claimed that he had been working for that company "gratis" until May 1, 1975.

**33.** Although we find it unnecessary to reach the question of waiver based on Rubinson's delay in moving for court appointed counsel, we do note that the right to counsel is fundamental in according due process to a defendant in a criminal proceeding. That right may be waived, in the context here claimed, only by a clear and deliberate attempt to frustrate orderly court procedure. Here Rubinson requested court appointed counsel more than a month before the trial was scheduled to begin, making it unlikely that his tardy request would delay the trial materially. See *Ungar v. Sarafite,* 376 U.S. 575, 589 (1964); cf. *United States ex rel. Martinez v. Thomas,* 526 F.2d 750, 755 (2 Cir. 1975). His claim that he would not be able to

■ We hold that the record clearly established that Rubinson was financially able to retain counsel and that he waived any right to counsel by proceeding to trial *pro se.* *United States ex rel. Davis v. McMann,* 386 F.2d 611, 618 (2 Cir. 1967), *cert. denied,* 390 U.S. 958 (1968); *United States v. Arlen,* 252 F.2d 491, 495–96 (2 Cir. 1958); *Spevak v. United States,* 158 F.2d 594, 596 (9 Cir. 1946), *cert. denied,* 330 U.S. 821 (1947).

■ True, a defendant should not be denied appointment of counsel solely because other members of his family have assets and income. And a defendant's own funds must be weighed against the anticipated cost of trial. *Hardy v. United States,* 375 U.S. 277, 289 n. 7 (1963). But a defendant's claim of indigency certainly should be rejected when he puts his own assets into his relatives' names and those assets remain at his disposal. Here the evidence clearly established that Rubinson owned or controlled substantial assets. To the extent that the assets were not in his own name, he had them put in the names of other members of his family to conceal them from his creditors, the government and the court.

We hold that the district court's finding that Rubinson was financially able to retain counsel was not clearly erroneous but was supported by overwhelming evidence.

### (B) *Chester*

Chester, a 49-year old attorney, also claims that the court erred in refusing to appoint counsel to represent him in the district court.[34]

The evidence established that Chester had been practicing securities law for 25 years. He was receiving $25,000 per year from one retainer as corporate counsel. He earned a total of $29,000 in 1974. He owned two cars. Together with his wife who worked as an airline stewardess, Chester was helping co-defendant Reynolds to pay some of his trial expenses. On the basis of this evidence alone, it would be difficult to think of a more disingenuous claim of financial inability to retain counsel.

■ With respect to the claims of both Rubinson and Chester that the district court erred in denying their applications for court appointed counsel, we hold that the court's finding as to each appellant of financial ability to retain counsel was not clearly erroneous; that its finding as to each was supported by substantial evidence; and that, to have found otherwise, would have resulted in a gross misuse of appropriated funds in view of the unmistakable intent of Congress in enacting the Criminal Justice Act—a result that Judge Motley commendably refused to sanction.

## VII. PROSECUTOR'S REBUTTAL SUMMATION

We suppose it is inevitable, in a trial of this complexity and length and especially with extensive summations that occupy more than 300 pages of the transcript, that claims of prejudice with respect to the prosecutor's summation would be raised. They have.

The only such claim which we believe warrants brief mention is that of Levine. During his summation, Levine's counsel made the statement to the jury which is set forth in the margin.[35] It related to the

---

prepare his own defense, largely because he had been incarcerated until October 10, 1975, probably was neither so absurd on its face nor so much a part of a series of dilatory tactics as to warrant, without more, the denial of appointment of counsel.

In view of the ground of our decision, however, we do not rule on this aspect of his alleged waiver of the right to counsel—i. e. waiver due to his delay in moving for court appointed counsel.

**34.** Chester's request for court appointed counsel was denied on four separate occasions:

once by Judge Knapp at Chester's arraignment on June 17, 1974; and three times by Judge Motley—at the second pre-trial conference on December 5–6, 1974, at the beginning of the trial on January 22, 1975, and at the time of sentencing on May 15, 1975.

**35.** "Now, you know, you have learned from this trial that prior similar acts can be proven for certain purposes by the prosecution. You know that if someone does something which the prosecutor says is wrong, the prosecutor, under some circumstances, is entitled

government's evidence that Stein had acted in a liaison role between Levine and certain of the other conspirators. In response, the prosecutor during his rebuttal summation argued as set forth in the margin [36] that Levine had engaged in a course of dealings with Stein and referred in some detail to the so-called Lockwood blotter which contained a list of numerous trades put through Lockwood, including many made by Stein and which various witnesses testified had been made during other stock manipulations.

The crux of this claim of error arises from that part of the summation by Levine's counsel that Levine was not a close associate of Stein, one of the prime movers in the S–H fraud who pleaded guilty and testified as a government witness. Levine's counsel argued that Levine had not become involved with S–H through Stein and that Levine's only transaction with Stein was in connection with Levine's refusal to act as the underwriter of a company named Blank Furniture. In rebuttal, the prosecutor responded by pointing out that Levine's counsel had not asked Stein while on the witness stand whether there were any other dealings between himself and Levine, and that the blotter of Levine's firm, Lockwood & Company, tended to contradict defense' counsel's claim since it showed that the firm had traded many of the stocks which Stein admitted on cross-examination he had illegally manipulated.

We do not believe that defense counsel opened the door in its summation to the challenged comments by the prosecutor in rebuttal. The government of course must sustain its burden of establishing a defendant's guilt beyond a reasonable doubt. Defense counsel certainly is entitled

to show similar prior conduct for certain purposes, which Judge Motley will instruct you about when she charges you on the law.

But, nevertheless, they can show it, and they eagerly try to show it whenever they have it. You have never been shown and you have not during the trial been shown any prior similar conduct or relationship between Mr. Levine and Mr. Wax and anybody else in this case, particularly Sidney Stein.

If they existed you would have been shown. Remember, Diston transactions were offered against some of these other men for reasons that Judge Motley will tell you. You never saw it here with them. The only relationship we know about in this case, and the only one that existed between Mr. Stein and Mr. Levine involved one transaction and that was the Blank Furniture deal . . . ."

36. "In addition, Mr. Andrews, after all of the evidence is in says there isn't any evidence that Mr. Levine or Mr. Wax were involved in any other transactions with Sidney Stein. Therefore, you should find, ladies and gentlemen, that this is a one-shot transaction, that all the rest of the time they were good little boys and they were never pulling off any frauds. You certainly didn't hear him ask that question when Stein was on the stand, did you?

'Did you get into any other deals with Mr. Levine?'

Did you hear him ask that one. Did you hear him ask Mr. Kaye [a co-defendant who testified for the Government] whether there were any other deals with Mr. Levine or Mr. Wax? You sure didn't hear him ask that when the witnesses were on the stand. He didn't have the nerve to do that.

Ladies and gentlemen, if you want to look at the evidence, you look at this evidence, the Lockwood blotter that is in evidence. [Holding the blotter up to the jury.] Mr. Wax's trades are in evidence. You are going to hear about some other stocks. Do you remember the stocks that Sidney Stein testified were manipulated stock, Allen Electronics. Beta Orthodontics, Boujeray Watches, which Kravetz testified to, Cadillac Knitting Mills. Calculator Computer, David Ault, General Auto Parts, Fallon Smith, the great Imperial stock, Lanai. Loric, Viking General. They are all in the record, ladies and gentlemen, of the stocks being manipulated and brought out on cross-examination of the government witnesses. You didn't see him have the guts to ask that question when they were on the stand.

Well, ladies and gentlemen, just look in Mr. Levine's blotter, if you are really interested in that. Look at what Mr. Wax was selling to his customers, if you are really interested in that. And you will find an answer to that particular problem.

But the government didn't present that originally. Not because we didn't have it, but because you should focus on the evidence that is related to Stern Haskell, and the government submits that you should not be misled by suggestions as to what is not in the evidence or suggestions that there is something that's been left out because it isn't there."

to direct the jury's attention to what he believes are loopholes in the government's case and to argue that these loopholes establish the non-existence of facts which the government would have proven if it had the evidence. While the prosecution in rebuttal may explain why it has not proven certain facts or respond to the interpretation which the defense has placed on its failure to present evidence, it may not use the defense's comments to justify the reference to facts or the assertion of claims which it could have, but did not, introduce at trial—unless defense counsel's remarks assert collateral, exculpatory alibis or defenses which the government would not have been expected to negate previously.

On the record before us, however, we hold that any error or prejudice, if there was any, arising from the prosecutor's summation was harmless beyond a reasonable doubt. Judge Motley specifically told the jury that the Lockwood blotter was in evidence only insofar as it related to S–H transactions. This cured not only the prosecutor's representation that the blotter was in evidence, but also any suggestion that similar dealing between Levine and Stein had been proven, since the only possible suggestion to that effect was based on the initial claim that the blotter was in evidence.

After the prosecutor had completed his rebuttal summation, Levine's counsel promptly made a vigorous objection to the prosecutor's comments now challenged on appeal and demanded a mistrial. He claimed that the prosecutor had prejudiced his client by stating that the entirety of the blotter was in evidence and by suggesting that there was evidence of prior illegal dealings between Levine and Stein.

While the parties had stipulated the admissibility of that part of the blotter which contained records of S–H transactions, there was disagreement as to whether the stipulation included the entire blotter which also listed transactions in other stocks which presumably had been manipulated by the conspirators. Initially, the court ruled that the blotter had been stipulated in evidence in its entirety. After further discussion between counsel the government agreed that the blotter had been stipulated in evidence only insofar as it listed S–H transactions. Accordingly, when the jury requested the blotter and other items, the court informed the jury that the only parts of the blotter which were in evidence were the references to S–H sales. The court told the jury that it could not have the remaining parts of the blotter and other items which it had requested. Although the prosecutor and defense counsel requested that the court give a further cautionary instruction, the court refused on the ground that such instruction would only highlight the suggestions which the prosecution had made in its rebuttal summation. Indeed, even if the court had not withdrawn the blotter from the jury's consideration, the fact that Stein had put his illegal sales through Lockwood would not indicate that Levine knew anything about Stein's illegal conduct. In addition to all this, the evidence against Levine was straightforward and overwhelming. We do not believe that the jury ignored the court's warning that only part of the blotter was in evidence and in fact relied in any meaningful way upon the prosecutor's comment. *United States v. Benter*, 457 F.2d 1174, 1178 (2 Cir.), *cert. denied*, 409 U.S. 842 (1972); *United States v. Bivona*, 487 F.2d 443, 447 (2 Cir. 1973).[37]

---

**37.** Rubinson and Reynolds also claim to have been prejudiced by the suggestion in the same portion of the prosecutor's rebuttal summation that the other transactions specified involved fraudulent conduct. Rubinson's claim is on a slightly different footing, namely, that he was prejudiced by the statement because he previously had been prevented from introducing evidence of the legality of these transactions on the ground that they were irrelevant. As with respect to Levine's claim, we hold that the

court's cautionary instruction cured the error claimed by Rubinson. Moreover, the other evidence with respect to Rubinson and Reynolds was so overwhelming as to render any error harmless beyond a reasonable doubt.

Chester also asserts other unrelated claims of error with respect to the prosecutor's rebuttal summation. We have carefully considered these claims and we find that they are without merit.

Upon the entire record, we hold that, if the government's rebuttal summation was prejudicial at all, it was harmless beyond a reasonable doubt.

We have carefully considered all of appellants' other claims of error and we find them to be without merit.

Appellants were convicted of serious crimes after a fair trial on the basis of overwhelming evidence. We order that the mandate issue forthwith.

Affirmed.