**UNITED STATES of America,**
**Plaintiff,**

v.

**Patrick QUINLAN, Defendant.**

**No. CR. 01–80514.**

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 19, 2002.

**817**

Stephen Hiyama, Jennifer Gorland, Asst. U.S. Attorneys, Detroit, MI, for Plaintiff.

Rita Chastang, James Gerometta, Federal Defenders, Detroit, MI, for Defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

Defendant Patrick Quinlan ("Quinlan") has asked the court to appoint counsel for him pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A(b). For the reasons explained below, Quinlan's request is denied.

On June 11, 2002, the Government filed a Fourth Superseding Indictment [41–1] charging Defendant Quinlan with conspiracy, mail fraud, wire fraud, bank fraud and making false statements to a federal agency in his capacity as CEO of Mortgage Corporation of America ("MCA"). On July 23, 2002, Quinlan sought court appointed counsel under 18 U.S.C. § 3006A. (Mot. Appt. Attorney [54–2], July 23, 2002 at 2.)

Pursuant to the directives of the CJA, the court has a duty to make an appropriate inquiry into the defendant's financial condition. *See* 18 U.S.C. § 3006A(b), *U.S. v. Sarsoun,* 834 F.2d 1358, 1361–62 (7th Cir.1987). Financial inability as considered for the purposes of the Act does *not mean indigency, but an inability to pay for counsel. See* 18 U.S.C. § 3006A(b), *U.S. v. Gipson,* 517 F.Supp. 230, 231 (W.D.Mich.1981) (Enslen, J.). The defendant must present "evidence sufficient to prove by a preponderance of the evidence that he is financially unable to employ counsel." *See U.S. v. Simmers,* 911 F.Supp. 483, 486 (D.Kan. 1995).

■ In determining whether a defendant is financially unable to obtain counsel, the court may inquire whether he has income or assets available to him from other sources, including his spouse.[1] *See Salemme*, 985 F.Supp. at 201 (citations omitted). "It is not enough to *claim* inability to hire a lawyer and back up the claim with an affidavit; the statute provides for 'appropriate inquiry' into the veracity of that claim." *U.S. v. Bauer*, 956 F.2d 693, 694 (7th Cir.1992) (emphasis in original). "A defendant has the burden of demonstrating that he is unable to afford counsel, especially when a pretrial hearing casts doubt on his need for public assistance." *See U.S. v. Lefkowitz*, 125 F.3d 608, 621 (8th Cir.1997).

In *U.S. v. Rubinson*, 543 F.2d 951 (2nd Cir.1976), the United States Court of Appeals for the Second Circuit confronted a similar situation. Defendant sought court appointed counsel even though he "lived in a large house in a wealthy community, shared a Rolls Royce and a Maserati with his son, had substantial interests in a number of corporations, had held a position as president of one corporation for 29 years, and had secreted his own wealth with that of his wife, his son, his mother-in-law and his father-in-law." *Id.* at 962. In rejecting defendant's request for appointed counsel, the Second Circuit held that "a defendant's claim of indigency certainly should be rejected when he puts his own assets into his relatives' names and those assets remain at his disposal. . . . To the extent that the assets were not in his own name, he had them put in the names of other members of his family to conceal them from creditors, the government and the court." *Id.* at 964.

■ This case is similar to *Rubinson*. While Quinlan has submitted forms showing that he has no income and assets to retain defense counsel, the uncontrovertible facts show that following the collapse of MCA in 1999, Quinlan purposefully divested himself of all his assets by giving them to his wife and children so as to hide his assets from his creditors and become "judgment proof." (Tr. Hrg. Aug. 27, 2002, at 39).

In early 1999, Quinlan mortgaged his Grosse Pointe house for $500,000 and sold the house to his daughter in August, 1999 for $785,000. (Tr. Hrg. Aug. 27, 2002 at 23). He testified that he paid his daughter $50,000 for an option to re-purchase his daughter's then-existing house[2] within three years for the 1999 sale price and gave her a $70,000 gift, evidenced by a letter as an off-set against the purchase price. (Tr. Hrg. Aug. 27, 2002, at 25–26, 52). Although Quinlan testified that his daughter obtained a loan of $629,000 to purchase the house, he did not testify that the amount was ever remitted to him. (Tr. Hrg. Aug. 27, 2002 at 25). He also testified that even without the option, his daughter would sell the house back to him if he asked, demonstrating that he still has control of the property. (Tr. Hrg. Aug. 27, 2002 at 28). I am convinced that Quinlan

---

**1.** Quinlan has voluntarily submitted financial information for both himself and his wife, Cheryl, in support of his motion to appoint counsel. His testimony that she had paid for significant portions of his legal expenses is sufficient evidence of her willingness to contribute to his defense. (Tr. Hrg. Aug. 27, 2002, at 32–34.) Thus, I can consider her assets in my determination of Quinlan's financial ability to afford an attorney. *See U.S. v. Salemme*, 985 F.Supp. at 201 (citing 7 Administrative Office of the United States Courts, *Guide to Judiciary Policies and Procedures, Appointment of Counsel in Criminal Cases,* § 2.03(C) (1993)).

**2.** Quinlan's daughter's then-existing house (401 Kercheval) also belonged to Quinlan in 1995, when Quinlan sold the house to his son, who subsequently sold it to Quinlan's daughter. (Tr. Hrg. Aug. 27, 2002 at 30).

orchestrated this transaction to give the house to his daughter and hide it from his creditors.

In February, 1999, Phil Matthews, Quinlan's fraternity brother and best man at his wedding, made an unsecured loan of $250,000 to Mrs. Quinlan to start a new business in South Florida. (Tr. Hrg. Aug. 27, 2002, at 16). When asked why the loan was made only to Mrs. Quinlan, Quinlan insisted that Matthews thought that his investment in the Quinlans' future was best made with a loan strictly to Mrs. Quinlan. *Id.*

In May, 1999, Quinlan and his wife used the Matthews loan and the mortgage from their Grosse Pointe home to purchase a home at 252 Venetian Drive, Delray Beach, Florida, for $900,000. (Tr. Hrg. Aug. 27, 2002, at 15). Soon after the purchase, Quinlan quit-claimed the house to his wife but received nothing in exchange. (Tr. Hrg. Aug. 27, 2002, at 32). Mrs. Quinlan then took out another mortgage on the Delray Beach home for $630,000. (Tr. Hrg. Aug. 27, 2002, at 41–42). On the mortgage application, Mrs. Quinlan stated that she had a net worth of $1,273,069.20. (Government's Brief Attachment A). When asked why he moved to South Florida so quickly after the collapse of MCA, Quinlan responded that he knew that Michigan had laws which protected spousal assets from creditors, and that he wanted to move to a state with similar protections for his wife and family. (Tr. Hrg. Aug. 27, 2002, at 14.) On the advice of an attorney, he was assured that Florida offered similar protections.

In 2001, Cheryl Quinlan sold the house for $947,500, and the proceeds were placed solely in her name. (Tr. Hrg. Aug. 27, 2002, at 50).

Other income was also funneled to Mrs. Quinlan's account. Bonnie Quinlan, defendant's mother, disinherited him, but left $150,000 to Mrs. Quinlan upon her death in 2000. (Tr. Hrg. Aug. 27, 2002, at 50–51). When asked why Bonnie Quinlan disinherited her son and chose instead to leave his inheritance to her daughter-in-law, his answer was unresponsive. (Tr. Hrg. Aug. 27, 2002, at 51).

Quinlan's testimony throughout the hearing was "evasive and disingenuous." *See U.S. v. Binder,* 794 F.2d 1195 at 1201 (7th Cir.1986). In *Binder,* the United States Court of Appeals for the Seventh Circuit upheld the trial court's denial of a motion for appointed counsel because defendant was "evasive and disingenuous" in rebutting the government's evidence that he "possessed substantial assets immediately prior to [his] indictment, engaged in a flurry of dubious financial activity after the indictment, and mysteriously could not account for either the source or the destination of large sums of money and valuable assets." *Id.* at 1202.

Quinlan's responses were similar here. He ran a very sophisticated mortgage company with 900 employees and offices nationwide. Despite his intimate knowledge of the mortgage business, Quinlan professed ignorance to many important details of his own finances. For instance, he testified that his wife's loan application, which was signed by Mrs. Quinlan, overstated her "Base Employee Income" by ten times the actual amount because "the broker filled [the] forms out." (Tr. Hrg. Aug. 27, 2002, at 48). When asked why he transferred money and real estate from jointly held accounts to accounts solely in his wife's name, he proffered evasive and conflicting testimony.[3] At first, he testi-

---

**3.** For example,
Q: The accounts—the financial accounts that were in your wife's name only, do you recall when they were established?

A: Not—I cannot.
Q: Were they established in 1999?
A: Yes, they were.
(Tr. Hrg. Aug. 27, 2002 at 37).

fied that he did not recall ever transferring assets to his wife's account. After further examination, he changed his testimony and admitted that he transferred all the assets to an account under his wife's name because he was "looking to the potential of litigation down the road" and wanted to become "judgment proof." (Tr. Hrg. Aug. 27, 2002, at 35–39.).

Faced with these uncontrovertible facts, it would be unconscionable to appoint a defense counsel at tax-payer's expense for Quinlan. His sophisticated scheme to hide his assets from his creditors and the government cannot justify this additional cost to the public. Thus, Quinlan's motion to appoint counsel, and his motion for an extension of time, are hereby DENIED and he is ordered to retain counsel for his defense within 30 days of this order.

It is further ordered that Ms. Chastang will discontinue her appointed representation of Quinlan for the purpose of appeal.

**IT IS SO ORDERED.**