**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2214
_____

UNITED STATES OF AMERICA

v.

EBON P.D. BROWN, a/k/a E-MURDER

Ebon P.D. Brown,
                              Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court  No. 2-11-cr-00193-001
District Judge: The Honorable Joy Flowers Conti

Argued May 13, 2014

Before: SMITH, VANASKIE, and SHWARTZ,
*Circuit Judges*

1

(Filed: August 27, 2014)

Rebecca R. Haywood, Esq. [Argued]
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA  15219
        *Counsel for Appellee*

Kimberly R. Brunson, Esq. [Argued]
Lisa B. Freeland
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA  15222
        *Counsel for Appellant*

————————————

OPINION

————————————


SMITH, *Circuit Judge.*

Ebon Brown brings this appeal following his conviction in the United States District Court for the Western District of Pennsylvania of unlawful possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1). He raises three arguments on appeal. First, he argues the District Court erroneously denied his motion to suppress

2

the firearm recovered by law enforcement. Second, he argues that the District Court erroneously admitted, under Federal Rule of Evidence 404(b), evidence that he had previously obtained guns through a straw purchaser. And third, he argues that a new trial is warranted because the District Court permitted the prosecutor to make improper statements during closing arguments.[1] We are not persuaded by Brown's argument that evidence of the firearm should have been suppressed. We agree, however, that the District Court erred in admitting evidence of Brown's past firearm purchases and by overruling Brown's objection to the prosecutor's closing arguments. Because the Rule 404(b) error was not harmless, we will vacate the judgment of the District Court and remand for a new trial.

## I.

In the early morning hours of March 23, 2011, four Pittsburgh Police Detectives—Judd Emery, Mark Adametz, Calvin Kennedy, and Thomas Gault—were patrolling Pittsburgh's Hill District in an unmarked

---

[1] Brown also argues that 18 U.S.C. § 922(g)(1) is unconstitutional under the Commerce Clause. Brown acknowledges that this argument is foreclosed by Third Circuit precedent, *see United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001) and *United States v. Shambry*, 392 F.3d 631 (3d Cir. 2004), and thus raises it for preservation purposes only.

police cruiser. As the detectives approached the intersection of Wylie Avenue and Duff Street, they observed a 2002 maroon Chevy Impala driven by Ebon Brown park near the intersection across the street from the Flamingo Bar, a nuisance bar where drug dealing and shootings regularly occur. All four detectives believed the Impala had been parked too close to the intersection in violation of 75 Pa. Cons. Stat. § 3353. *See* App. 115, 178, 191, 210.

The detectives stopped their cruiser in the middle of the street and watched as Brown and three other passengers exited the Impala. As Brown was stepping out, he looked in the detectives' direction and appeared to recognize their unmarked cruiser. Brown then sat back down in the Impala and made a motion which appeared consistent with removing an object from his waistband and placing it beneath the driver's seat. Brown then stepped out of the vehicle, closed the door, and walked in the direction of the Flamingo Bar. All four detectives testified that, based on their experience, they believed Brown had removed a gun from his person and attempted to conceal it under the driver's seat. *See* App. 117–22, 169, 205, 221–22.

The detectives exited the police cruiser and approached Brown and the other passengers. The detectives' badges were visible and they identified themselves as Pittsburgh police officers. Detective Gault began speaking with Brown and informed him that the

4

Impala was parked in an illegal location. As this exchange was taking place, Detective Emery walked around to the passenger side of the Impala and shined his flashlight through the windshield. With the inside of the vehicle illuminated, Detective Emery observed "the grip and rear slide portion of a semi-automatic firearm sticking out from underneath the driver's seat." App. 172. Detective Emery immediately gestured to Detective Gault (by extending his thumb and index finger) that there was a gun in the vehicle. After seeing Detective Emery's gesture, Detective Gault grabbed Brown to prevent him from fleeing. The detectives then asked Brown whether he had a permit to carry the firearm. When Brown answered that he did not, they placed him under arrest.

Detective Emery retrieved the gun from the Impala, cleared a round from the chamber, and placed it in the trunk of the detectives' cruiser. The detectives then performed pat-down searches of the other passengers, but found no weapons and did not place anyone else under arrest. At Brown's request, the detectives gave the keys to the Impala to another passenger, James Cole. Cole moved the Impala to a legal parking space, and then he and the others proceeded to the Flamingo Bar.

The Government charged Brown in a single-count indictment for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Prior to trial, Brown filed a motion to suppress the evidence of the gun

retrieved from underneath the Impala's seat. He argued that the police conducted an unlawful *Terry*[2] stop and that they did not have a lawful basis to search the vehicle. The District Court denied the motion to suppress, app. 1–20, and Brown proceeded to trial.

Brown's theory at trial was that the firearm belonged to his girlfriend, Brittney McCoy, and that she had left it beneath the seat of the Impala without his knowledge. McCoy testified for the defense and corroborated Brown's story. McCoy explained that she had borrowed the Impala from its owner, Cassandra Whitaker, on the evening of March 22, 2011, because she needed it for an appointment the following morning.[3] App. 628–29. McCoy stated that immediately after borrowing the car, she removed the gun—which she had

---

[2]     *Terry v. Ohio*, 392 U.S. 1 (1968).
[3]     Whitaker also testified for the defense and confirmed that she frequently loaned her car to family members and friends, including McCoy and Brown, and that she had loaned the Impala to McCoy on March 22, 2011. App. 581–82.

purchased for personal protection in August 2009[4]—from her purse and placed it under the driver's seat. She then drove the Impala to Brown's house and parked it in the driveway directly behind Brown's car. According to McCoy, later that evening while she and Brown were trying to sleep, her nephew called and asked Brown to give his girlfriend a ride somewhere. Brown agreed and left in the Impala (because it was blocking his car in), not knowing the gun was under the seat. App. 632.

The Government maintained that Brown physically possessed the gun and placed it under the seat of the Impala after he spotted the police cruiser. The Government also argued that even though McCoy purchased the gun, she had really purchased it for Brown. To establish this claim, the Government sought to introduce under Federal Rule of Evidence 404(b)

---

[4]   McCoy and Whitaker both testified regarding the events that prompted McCoy to purchase the gun. In August 2009, four armed gunmen broke into Whitaker's home looking for money to settle debts owed by McCoy's brother, who also happened to be the father of Whitaker's son. Whitaker stated that the attackers did not find money in the home, but stole her television, gun, clothing, jewelry, and car. They then tied her up and left the house. Whitaker eventually untied herself and called the police. She then called McCoy to let her know what had happened and to let her know to be careful. Fearing for her own safety, McCoy, accompanied by Whitaker, purchased the gun the following day.

statements that Brown made nearly seven years earlier in 2005 admitting that he had used a straw purchaser to acquire firearms. In January 2005, Brown was arrested by Pittsburgh police for public urination. Pursuant to a lawful search of Brown's vehicle in connection with his arrest, police officers recovered a handgun and more than 250 stamp bags of heroin. After his arrest, Brown agreed to speak with agents of Pittsburgh's Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATFE). Brown informed ATFE agents that he had repeatedly sold heroin to a "white male" who had agreed to buy firearms for Brown in exchange for the drugs. Brown claimed that the white male had purchased twelve guns on six different occasions, which Brown then sold to friends and relatives. Brown was later convicted of possession with the intent to distribute heroin and possession of a gun in furtherance of a drug trafficking crime. He was not charged with any crime related to the straw purchase transactions.

In a pretrial motion, Brown sought to exclude the statement he had made to the ATFE agents about using a straw purchaser to obtain firearms. In response, the Government argued the statement was "relevant to show that [Brown] did have the knowledge that there was a firearm in his car and that he knows what firearms are." App. 388. Further, the Government argued that these statements supported its theory that McCoy "straw purchased this firearm for [Brown]." App. 389. Brown

countered that the statement would be relevant only for propensity purposes, merely showing that if he had used straw purchasers before, then he must have used McCoy as a straw purchaser for this gun. He also argued that the Government did not have any evidence that McCoy was involved in the earlier straw purchases or that she purchased this firearm in concert with Brown. App. 388.

After hearing from the parties, the District Court agreed with the Government and concluded that the evidence was relevant "to show motive or knowledge and that type of thing along those lines." App. 390. However, the Court concluded the statements would be admissible only if McCoy took the stand and testified that she had purchased the firearm for personal purposes. App. 388, 431–33, 650–52. The Court also limited the manner in which the evidence could be introduced, allowing the Government to introduce only a stipulation that Brown used straw purchasers to acquire guns. The parties agreed to the language of a stipulation, which was read to the jury at the close of evidence. The stipulation provided: "The defendant acknowledges using straw purchasers/third parties to purchase firearms for him in the past." App. 683. Despite Brown's agreement to the language of the stipulation, the Court noted his continuing objection to its admissibility under Rule 404(b).

During summation, defense counsel argued that there was a gap in the prosecution's case because there

was no fingerprint evidence connecting Brown to the gun. Defense counsel stated that "none of us would have to be here today if there had been a fingerprint analysis because it would show what you already know, that Mr. Brown never possessed that gun or ammunition." App. 765. At the conclusion of defense counsel's closing argument, the prosecution requested an instruction stating that the Government was not legally obligated to use any particular investigative technique. App. 779. The Court agreed and gave the following instruction:

> You have just heard argument by counsel that the government did not use specific investigative techniques, such as fingerprint analysis. You may consider these facts in deciding whether the government has met its burden of proof . . . . However, there is no legal requirement that the government use any specific investigative technique . . . .

App. 784.

The prosecutor then began his rebuttal by flipping defense counsel's argument, stating that "[w]e haven't heard any expert from the defense" regarding fingerprints. App. 785. Brown objected to this remark and argued that it impermissibly placed a burden on the defense. The Court sustained the objection and struck the comment. App. 786. The prosecutor then continued to address the lack of fingerprints. "I want to see if we can

talk about your own common sense in your daily experience about fingerprints,'' he said. App. 786. The prosecutor explained that, in the heat of the moment, detectives do not have time to "get out . . . rubber gloves, to put this thing in a paper bag, and then go walk it over to the police vehicle and put it in a plastic evidence bag." App. 787. He then followed this point with the following remarks, which are central to one of Brown's arguments on appeal:

> You heard the officer, the first thing he did on this particular occasion was to take [the gun], he moved the slide back to take the one round that was in the chamber out of there . . . . And then he extracted the other rounds from the magazine . . . . He quickly put it back in the police car and in the process of doing that, he put his own fingerprints on what may have possibly existed there. We have no way of knowing whether there could be fingerprints on there, but I want to talk about your own common sense and your daily experiences.

> Many of you probably have children. Your children probably touch your coffee table. Coffee table may have a glass top to it. When you see those marks that are on the coffee table from your children, do you see fingerprints of the type when the police

11

officers roll fingerprints or do you see smudges and smears, things that come into contact with that but could not be called fingerprints? They're smudges and smears. Even on a nice, clean, smooth surface like a piece of glass that is on your coffee table you find only smears and smudges, you do not find fingerprints.

App. 787–88.

At this point, defense counsel objected and argued the prosecution was testifying about facts that were not in evidence. App. 788 ("You don't see fingerprints on glass surfaces. We didn't hear testimony about that."). Defense counsel argued that "the [prosecutor's] statement fairly implied, if not explicitly stated, that a fingerprint could only smudge or smear glass, not put fingerprints on it, which is — he could suggest that is common sense, that that's a fact, but it's not — we didn't hear testimony on that, so we need a qualifier." App. 789. The District Court overruled the objection and allowed the prosecutor to continue making the argument "as long as [he] direct[ed] [his statements] to common sense and [not the jurors'] everyday lives." App. 789.

After the objection was overruled, the prosecutor continued arguing that the jurors' common sense should inform them that smudges and smears on a glass table "are not the type of fingerprints that one would roll from

a police thing." App. 790. He then extrapolated this point to the firearm recovered by law enforcement, arguing that the jurors' common sense should inform them that a gun with a "microtextured surface" is equally unlikely to hold fingerprints. App. 790. (rhetorically asking the jurors: "Is it likely that you're going to find fingerprints on [a firearm with a microtextured surface], from your own experience, from your common sense . . . ?").

The jury returned a verdict convicting Brown of the single § 922(g)(1) offense charged. The District Court subsequently sentenced Brown to a 92-month term of imprisonment. This timely appeal followed.[5]

## II.

Brown raises three arguments on appeal. First, he contends the District Court erroneously denied his motion to suppress the firearm. Second, he argues the stipulation about his prior use of a straw purchaser was improperly admitted. And third, he argues that a new trial is warranted because the prosecutor made improper statements during his closing argument that fundamentally affected the fairness of the trial. We address these arguments *seriatim*.

## A.

---

[5] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C § 1291.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Brown contends that both his seizure by police and the seizure of the firearm and ammunition from the Impala were violative of his Fourth Amendment rights. We disagree.

Police encounters with citizens fall into one of three broad categories, each with varying degrees of constitutional scrutiny: "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006). The first type of encounter does not implicate the Fourth Amendment. *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005) (stating that officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in other public places"); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991). The second category (i.e., brief seizures or *Terry* stops) requires a showing that the officer acted with reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (stating that an officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot") (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). And the third category (i.e., full-scale arrests) is proper only when an officer has probable cause. *Beck v. Ohio*, 379 U.S. 89, 91 (1964) ("Whether [an] arrest was constitutionally valid depends . . . upon whether, at the moment the arrest

14

was made, the officers had probable cause to make it."). Here, the detectives' brief interaction with Brown touched on all three but was valid under each.

The initial step in our suppression analysis is to determine whether a seizure has taken place and, if so, when the seizure occurred. *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008); *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (stating that in conducting a suppression analysis, the court "must first determine at what moment [the defendant] was seized"). As already noted, a Fourth Amendment seizure "does not occur simply because a police officer approaches an individual and asks a few questions." *Bostick*, 501 U.S. at 434. Rather, "[a] seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Terry*, 392 U.S. at 19–20 n.16).

We apply an objective test when evaluating whether an officer's "show of authority" would have led a reasonable person to believe they were not free to leave. *Crandell*, 554 F.3d at 84 (stating that the test is whether a reasonable person in light of all the circumstances would have perceived the officer's actions as restrictive). The Supreme Court has articulated several factors to be considered as part of this objective inquiry, including, *inter alia*, "the threatening presence of several officers, the display of a weapon by an officer, some

physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554–55 (1980); *see also United States v. Drayton*, 536 U.S. 194, 204 (2002).

Considering these factors, we agree with the learned District Judge that no seizure occurred prior to the moment Detective Gault physically grabbed Brown to prevent him from fleeing the scene. There was nothing about the detectives' brief initial approach that constituted a Fourth Amendment seizure. The evidence at the suppression hearing shows that the detectives did not activate their lights or sirens, brandish their weapons, block Brown's path, physically touch Brown, or make any threats or intimidating movements. Instead, the detectives merely exited their cruiser and approached Brown in a public space to discuss their concerns about where the Impala was parked.

Brown argues that the detectives demonstrated their authority by approaching in a group of four, displaying their badges, and identifying themselves as Pittsburgh police officers. These facts are not enough to tilt the balance in Brown's favor. A Fourth Amendment seizure does not occur merely because police officers identify themselves when engaging a citizen in conversation. And although the detectives approached in a group, as the District Court found, "there was 'no threatening presence,' since the number of detectives

16

evenly matched the number of individuals who had exited the Impala." App. 11 (citing *Mendenhall*, 446 U.S. at 554). We agree with the District Court that the totality of the circumstances suggests that the detectives' approach and initial contact with Brown was a mere encounter that did not implicate the Fourth Amendment.[6]

Although the detectives' initial interaction with Brown did not implicate the Fourth Amendment, the encounter ripened into a *Terry* stop at the moment Detective Gault grabbed Brown's waistband to prevent him from fleeing. Although this conduct constituted a Fourth Amendment seizure, it is well-established that officers do not need to obtain a warrant to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is

---

[6] Brown also argues that the detectives made a "show of authority" by taking action that was "more aggressive than necessary." Appellant's Br. at 28. More specifically, he argues that if the detectives "were concerned about the safety of the Impala's position, they should have rolled down their windows and asked that it be moved" rather than approaching on foot. This argument misses the point. The question is not what course of conduct the detectives "should" have pursued, but whether their actions were constitutionally permissible. As already explained, the brief initial encounter did not constitute a Fourth Amendment seizure. The simple fact that the detectives could have taken another course of action does not render their conduct unconstitutional.

afoot." *Wardlow*, 528 U.S. at 123 (citing *Terry*, 392 U.S. at 30).

Reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The officer must simply have some objective justification for the stop and must be able to articulate more than an "unparticularized suspicion or 'hunch'" that the suspect is engaged in criminal activity. *Wardlow*, 528 U.S. at 124 (citing *Terry*, 392 U.S. at 27). When making reasonable suspicion determinations, reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *Cortez*, 449 U.S. at 418). We "give considerable deference to police officers' determinations of reasonable suspicion." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006)

We agree with the District Court that Detective Gault's brief seizure of Brown was supported by

reasonable suspicion. Detective Gault grabbed Brown after Detective Emery had legally observed the firearm under the Impala's driver's seat and communicated his discovery by making a hand gesture. Although there may be some circumstances where simple knowledge of a firearm does not provide reasonable suspicion for a *Terry* stop, *see United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000), here the observation of the firearm is considered in conjunction with the fact that the officers witnessed Brown make furtive movements consistent with an attempt to conceal the weapon and the fact that the encounter occurred in a "high crime area." *Wardlow*, 528 U.S. at 124; *see id.* ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); *United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000) (noting the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a *Terry* analysis). Viewing these circumstances as a whole, we find that the brief detention of Brown was justified by reasonable suspicion.

We also find no constitutional infirmity with Brown's subsequent custodial arrest. Immediately after seizing Brown, the detectives inquired whether he had a permit to carry the firearm. When Brown answered that he did not, the officers placed him under arrest. Brown's admission that he lacked a permit to carry the firearm

provided probable cause to support his arrest.

The detectives also did not violate the Fourth Amendment when they recovered the gun from the Impala. Officers may conduct a warrantless search of a vehicle incident to arrest in two instances: "(1) if the arrestee is within reaching distances of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'" *Davis v. United States*, 131 S. Ct. 2419, 2425 (2011) (quoting *Arizona v. Gant*, 332 U.S. 332, 344 (2009)). This case fits squarely within the second exception because unlawful firearm possession was the crime for which Brown was arrested.

For these reasons, we will affirm the District Court's denial of Brown's motion to suppress the firearm.

## B.

Brown next challenges the District Court's decision to allow the Government to introduce evidence that he had previously used a straw purchaser to obtain firearms. We hold that the admission of this evidence was improper.

Federal Rule of Evidence 404(b), which governs the admissibility of a defendant's prior bad acts, provides that "[e]vidence of a crime, wrong, or other act is not

20

admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The rule states, however, that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

We have explained that Rule 404(b) is generally a rule of exclusion. *United States v. Caldwell*, — F.3d —, 2014 WL 3674684, at *5 (3d Cir. July 24, 2014). It "directs that evidence of prior bad acts be excluded— *unless* the proponent can demonstrate that the evidence is admissible for a non propensity purpose." *Id.* Our opinions have repeatedly and consistently emphasized that the party seeking to admit evidence under Rule 404(b)(2) bears the burden of demonstrating its applicability. *Id.* at *6.

There are four distinct steps that must be satisfied before prior bad act evidence may be introduced at trial: (1) it must be offered for a proper non-propensity purpose that is at issue in the case; (2) it must be relevant to that purpose; (3) its probative value must not be outweighed by the danger of unfair prejudice under Rule 403; and (4) it must be accompanied by a limiting instruction, if one is requested. *Caldwell*, 2014 WL 3674684, at *7 (citing *United States v. Davis*, 726 F.3d 434, 441 (3d Cir. 2013)). This methodical process

requires "careful precision" by both the proponent in proffering the prior act evidence and by the trial judge who must decide the question of admissibility. *Id.* at \*4.

At trial, the Government argued that Brown's 2005 statement to ATFE agents that he had used a straw purchaser to obtain firearms was "relevant to show that he did have the knowledge that there was a firearm in his car and that he knows what firearms are." App. 388. Applying the framework described above, we must first determine whether the identified non-propensity purpose (here, "knowledge") is at issue in the case, and then evaluate whether the evidence is relevant to that purpose.

When evaluating whether a non-propensity purpose is at issue, we "consider the 'material issues and facts the government must prove to obtain a conviction.'" *Caldwell*, 2014 WL 3674684, at \*6 (quoting *United States v. Sampson*, 980 F.2d 883, 888 (3d Cir. 1992)). In other words, the government cannot offer Rule 404(b) evidence for a non-propensity purpose if doing so would not materially advance the prosecution's case. Here, Brown was charged with unlawful possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1), which requires proof that: "(1) the defendant has been convicted of a crime of imprisonment for a term in excess of one year; (2) the defendant knowingly possessed the firearm; and (3) the firearm traveled in interstate commerce." *United States v. Huet*, 665 F.3d 588, 596 (3d Cir. 2012). Thus, the Government may

22

introduce Rule 404(b) evidence only if it is offered for a non-propensity purpose that is probative of one of the elements essential for a conviction.

We reject out of hand the Government's argument that the evidence was admissible to show that Brown "knows what firearms are." App. 388. It is conceivable that a defendant might challenge a § 922(g)(1) charge by claiming he does not know what a firearm is.[7] In the ordinary course, however, a defendant's general knowledge about firearms is not in question in a felon-in-possession case, and the government is thus not required to show that the defendant "knows what firearms are" to secure a conviction. To be sure, Brown did not claim he was unfamiliar with firearms. Absent such a claim or suggestion by a defendant, a rule permitting the introduction of Rule 404(b) evidence for the purpose of showing the defendant "knows what firearms are" would have the effect of rendering all prior bad acts related to

---

[7] Unlike a drug case, where the unfamiliar nature of the substance may allow a defendant to claim he mistook the substance for something else or otherwise did not know he possessed drugs, *see, e.g.*, *United States v. Long*, 225 F.3d 656 (4th Cir. 2000) (per curiam) (defendant claiming he did not know the substance at issue was cocaine, but believed it to be a hormone stimulant to help chickens become better fighters), it is difficult to imagine a scenario where a defendant could contend he did not know the object in his possession was a firearm. Indeed, we have been unable to find any case where a defendant has made such a defense.

23

firearms admissible in a felon-in-possession trial. Such a result could not have been the intent of the drafters of the Federal Rules of Evidence.

We thus turn to whether the evidence was admissible to show Brown "had knowledge there was a firearm in his car." App. 388. We have recently explained that a defendant's knowledge is rarely at issue in a weapons-possession case when the prosecution relies exclusively on a theory of actual possession. *Caldwell*, 2014 WL 3674684, at \*8. This is because, "absent unusual circumstances . . . , the knowledge element in a felon-in-possession case will necessarily be satisfied if the jury finds the defendant physically possessed the firearm." *Id.* In contrast, however, "[e]vidence of knowledge . . . is critical in constructive possession cases, as '[a] defendant will often deny any knowledge of a thing found in an area that is placed under his control (e.g., a residence, an automobile) or claim that it was placed there by accident or mistake.'" *United States v. Williams*, 620 F.3d 483, 489 (5th Cir. 2010) (quoting *United States v. Jones*, 484 F.3d 783, 788 (5th Cir. 2007)). This case presents the "paradigmatic constructive possession scenario," *United States v. Garner*, 396 F.3d 438, 443 (D.C. Cir. 2005), where a firearm is found in proximity to a defendant who claims he did not know it was there. Accordingly, we have no difficulty concluding that showing Brown's knowledge that the gun was in the Impala was an appropriate non-propensity purpose for

24

offering the evidence of Brown's previous straw purchases.

Yet it is not enough for the Government to merely identify a valid non-propensity purpose under Rule 404(b)(2). Crucially, the Government must also show that the evidence is relevant to that purpose. To do so, the prosecution "must clearly articulate how that evidence fits into a chain of logical inferences, no link of which can be the inference that because the defendant committed [the proffered prior offense], he therefore is more likely to have committed [the charged offense]." *Sampson*, 980 F.2d at 887. This is where the Government's proffer falls short. The Government has completely failed to explain how the fact that Brown used a straw man in 2005 to *purchase* firearms tends to prove that he knowingly *possessed* the gun under the driver's seat of the Impala six years later. These are two entirely distinct acts, and participation in one has no relationship to the other. *See Davis*, 726 F.3d at 443 (holding that defendant's prior conviction for cocaine *possession* not admissible to show knowledge in a trial for cocaine *distribution* because "[p]ossession and distribution are different in ways that matter"); *cf. Caldwell*, 2014 WL 3674684, at *12 ("If the prior possession was of a different gun, then its value as direct or circumstantial evidence of the charged possession drops and the likelihood that it is being used to show propensity to possess guns rises considerably. Similarly,

25

as the prior possession is further removed in time, it becomes less probative of possession on the date charged.") (citation omitted).

The Government's primary argument, which was accepted by the District Court, is that the straw purchaser evidence refutes McCoy's testimony that she purchased the gun for her own personal protection. According to the Government, the fact that Brown used a straw purchaser in the past makes it more likely that he used McCoy as a straw purchaser to obtain the gun recovered by the detectives. Extrapolating from this proposition, the Government argues then that it is likely that Brown knew about the gun in Whitaker's Impala. There are multiple problems with this line of reasoning.

First, the fact that Brown used a straw purchaser to obtain firearms in 2005 does not discredit McCoy's testimony that she purchased the gun for personal protection in August 2009. The circumstances surrounding Brown's use of a straw purchaser were unique to him—he was selling heroin to an unnamed individual who agreed to purchase firearms in exchange for drugs. There is no parallel between that scenario and McCoy's purchase of the firearm in August 2009, one day after four armed men assaulted her friend in an attempt to collect debts owed by her brother. The Government did not present evidence disputing the sequence of events surrounding McCoy's purchase of the firearm. An even more conspicuous omission was its

26

failure to present evidence that McCoy had previously participated in a straw purchase with Brown (or anyone else for that matter). And significantly, this all occurred while Brown was still serving a prison sentence for his 2005 conviction. It is simply too great a leap in logic to suggest that because Brown once used a straw purchaser in a quid pro quo drug transaction, he must also have used McCoy as a straw purchaser for the gun recovered in Whitaker's Impala. And it is an even greater leap to then conclude that such a strained inference somehow made it more likely than not that Brown constructively possessed the firearm.

All of this aside, there is an even more fundamental problem with the Government's proffer under Rule 404(b). Quite simply, the Government's chain of inferences is indubitably forged with an impermissible propensity link. The first logical step in the Government's analysis requires the jury to conclude that because Brown used a straw purchaser in the past, he must therefore have used a straw purchaser here. This is propensity evidence, plain and simple. *Davis*, 726 F.3d at 442 ("[T]he government must explain how [the evidence] fits into a chain of inferences—a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference.").

Our concern that the evidence went only to show Brown's propensity to commit gun crimes is not alleviated by the District Court's explanation for why the

evidence was admitted. As we have explained, "[t]he district court, if it admits the evidence, must in the first instance, rather than the appellate court in retrospect, articulate reasons why the evidence also goes to show something other than character." *Sampson*, 980 F.2d at 888; *see also Caldwell*, 2014 WL 3674684, at *7 ("[O]ur decisions are . . . emphatic in requiring the proponent *and the trial judge* to articulate, with precision, a chain of inferences that does not contain a propensity link.") (emphasis added). After hearing from the parties, the Court concluded that the prosecution could "use this [evidence] to show motive or knowledge *and that type of thing along those lines*." App. 390 (emphasis added). This statement does not reflect the type of "careful precision" our precedent demands. *Caldwell*, 2014 WL 3674684, at *4. It supplies the defendant with little notice of the non-propensity purpose for which the evidence against him is being admitted, and it says nothing of how the evidence is probative of that purpose. Of course, "a mere recitation of the purposes in Rule 404(b)(2) is insufficient." *Davis*, 726 F.3d at 442; *see also* Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:28, at 730 ("[I]t is lamentably common to see recitations of laundry lists of permissive uses, with little analysis or attention to the particulars.").

When confronted with a proffer under Rule 404(b), a district court should not merely inquire of the prosecution what it wishes the evidence to prove. Rather,

28

the court should also require the prosecution "to explain 'exactly *how* the proffered evidence should work in the mind of a juror to establish the fact the government claims to be trying to prove.'" *Caldwell*, 2014 WL 3674684, at *12 (quoting *United States v. Miller*, 673 F.3d 688, 699 (7th Cir. 2012)) (emphasis added). In our case, that means the District Court should have asked the Government to answer this question: "How, exactly, does Brown's admission to ATFE agents that he sold heroin in exchange for firearms in 2005 suggest that he had knowledge of the gun found under the driver's seat of the Impala on the morning of March, 23, 2011?" Put to this task, the Government would have been unable to articulate the requisite chain of inferences without resort to propensity-based links or attempts to build a bridge too far.[8]

---

[8] The Government has modified and expanded its position on appeal. It now argues that the evidence of past straw purchases is relevant to show not only that Brown knew the gun was in the Impala, but also that he "knew how to obtain a gun through the use of a straw purchaser, had the intent to possess the firearm, and his possession was not unknowing, accidental or mistaken." Gov't Br. at 41. Setting aside that these arguments were not advanced in its proffer before the District Court, the Government has still not shown that these are proper grounds for admission. The material issue in the case was whether Brown knew the gun was under the driver's seat of the Impala, not whether he knew how to

29

For these reasons, we conclude that the evidence that Brown used a straw purchaser to obtain firearms in the past was admitted in error. Nevertheless, the Government maintains that, even if erroneous, the admission of evidence regarding Brown's past use of a straw purchaser was harmless. "The test for harmless error is whether it is 'highly probable that the error did not contribute to the judgment.'" *United States v. Cunningham*, 694 F.3d 372, 391–92 (3d Cir. 2012) (citation omitted). We will find such a high probability only when we have a "sure conviction" that the error did not unfairly prejudice the defendant. *Id.* at 392.

The Government contends the error was harmless because the evidence of Brown's past involvement with a straw purchaser was introduced only by way of a brief stipulation that did not discuss the specific details of the prior act. We are not persuaded by this argument. Whether offered in a brief stipulation or a simple "yes" or "no" question on cross-examination, the prejudicial impact of prior bad act evidence is significant. As the Supreme Court has explained, when—as here—proffered prior bad act evidence serves only to show the

_____

obtain firearms through straw purchasers. And for the same reasons set forth above, it is too great a leap to suggest that the fact that Brown used a straw purchaser to obtain guns seven years ago tends to prove his intent to possess the gun that is the subject of this charged crime.

defendant's propensity to act unlawfully, "it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 476 (1948)). *See also* Fed. R. Evid. 404(a) Advisory Committee's Note ("Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."). In this case, the stipulation suggested to the jury that Brown was a bad actor with a history of gun crimes. This necessarily impugns his character and tends to impermissibly sway the balance in the Government's favor. To hold the error harmless merely because the evidence was offered by way of stipulation would create a blueprint for introducing improper Rule 404(b) evidence in a manner insulated from the consequences of appellate review. We decline to endorse such a rule.

The Government also argues the error was harmless because the remainder of the Government's evidence that Brown knowingly possessed the gun was "overwhelming." Gov't Br. at 51. There is no doubt that the Government presented a substantial case against Brown, including offering consistent testimony from all

31

four detectives that he made furtive movements consistent with concealing a firearm under the driver's seat of the Impala. At the same time, however, the Government failed to present anyone who could put the firearm in Brown's hands. And Brown introduced his own witness, McCoy, who testified that she placed the gun under the seat without Brown's knowledge. In the end, it may well be that the jury would have convicted Brown with or without the straw purchaser stipulation. Nonetheless, there is not enough on this record for us to possess a "sure conviction" that this is so. We therefore must conclude the error was not harmless.

## C.

Because we conclude that the erroneous admission of Rule 404(b) evidence was not harmless error, we are not required to address Brown's final contention that the District Court erred by not sustaining his objection during the prosecutor's rebuttal summation. However, in the interest of providing guidance to the District Court on remand, we will briefly explain why the prosecutor's remarks during rebuttal were improper.

Brown argues that the prosecutor improperly testified about facts not in evidence when he suggested (1) that Brown's fingerprints were covered up by the detective who retrieved the gun from the Impala, and (2) that fingerprints could not be recovered from smooth surfaces like a glass table or the exterior of a gun. We

32

agree with Brown's argument.

Improper statements made during summation may warrant a new trial when such statements "cause[] the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (internal quotation marks and citations omitted). Our first task is to determine whether the prosecutor's comments were improper. *United States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir. 1999). "If we conclude that a comment was improper, we must apply a harmless error analysis, looking to see if 'it is *highly probable* that the error did not contribute to the judgment.'" *Id.* (quoting *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc)).

During closing arguments, a criminal defendant "certainly is entitled to direct the jury's attention to what he believes are loopholes in the government's case and to argue that these loopholes establish the non-existence of facts which the government would have proven if it had the evidence." *United States v. Rubinson*, 543 F.2d 951, 965–66 (2d Cir. 1976). Rebuttal summation provides the Government an opportunity to respond to those arguments. "As a general rule, Government counsel should not be allowed to develop new arguments on rebuttal, but should be restricted to answering the arguments put forth by defense counsel." *United States v. Taylor*, 728 F.2d 930, 936 (7th Cir. 1984) (citations

omitted). "While the prosecution in rebuttal may explain why it has not proven certain facts or respond to the interpretation which the defense has placed on its failure to present evidence, it may not use the defense's comments to justify the reference to facts or the assertion of claims which it could have, but did not, introduce at trial." *Rubinson*, 543 F.2d at 966; *see also United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989) ("[I]t is improper to base closing arguments upon evidence not in the record."); Charles Alan Wright *et. al*, *Federal Practice and Procedure* § 588 (4th ed. 2011) ("It is misconduct for a prosecutor to make an assertion to the jury of a fact, either by way of argument or by an assumption in a question, unless there is evidence of that fact.").

We conclude that the prosecutor's argument that fingerprints could not have been extracted from the firearm inappropriately relied on facts not in evidence. During his closing, defense counsel questioned the Government's proof by pointing out the lack of forensic fingerprint evidence. It would have been permissible for the prosecution to respond to this argument by noting the general challenges police officers face in trying to preserve forensic evidence in the rapidly-unfolding events surrounding an arrest. It was not appropriate, however, to suggest or speculate that the particular firearm at issue was incapable of retaining identifiable fingerprints—at least not without evidence to substantiate

that claim. The Government could have presented expert testimony to explain that the surface of the firearm at issue would not hold fingerprints, or that the detectives covered up any identifiable prints when they removed the gun from the Impala. Failing to do so, however, the Government was not permitted to make this argument during its rebuttal summation. In short, the prosecutor was testifying.

The Government contends that the prosecutor was merely asking the jurors to use their own common sense and attempting to draw upon their "ordinary experiences concerning when fingerprint evidence would be recoverable." Gov't Br. at 58. We seriously doubt that jurors possess a common understanding of the circumstances under which investigators can extract fingerprints from a weapon, a glass table, or any other surface. A juror may have observed a smudge on her coffee table, but that does not translate into an understanding of when such a smudge can be extracted by law enforcement as an identifiable fingerprint.[9] Nor does it provide the juror with a "common sense" understanding about whether the "microtextured surface" of a firearm will hold fingerprints. App. 790.

To be sure, the Government was not legally

---

[9] Indeed, the District Court even challenged the prosecutor's suggestion, stating "You can get fingerprints off glass, if it's done right." App. 789.

35

obligated to conduct a fingerprint analysis of the firearm in the Impala. Nor was it required to offer a forensic expert at trial in order to carry its burden of proof. Indeed, at the Government's request, the jury was instructed that "there is no legal requirement that the government use any specific investigative technique" in order to establish Brown's culpability. App. 784. Yet by electing not to present such evidence explaining its inability to obtain fingerprints from the firearm, the Government could hardly then argue that issue to the jury. We conclude the prosecutor's remarks were improper.[10]

## III.

For the reasons set forth above, we will vacate the judgment of the District Court and will remand for a new trial.

---

[10] In the ordinary course, we would now turn to consider under a harmless error analysis whether the improper comments were so prejudicial that a new trial is warranted. *See Mastrangelo*, 172 F.3d at 297 ("If we conclude that a comment was improper, we must apply a harmless error analysis . . . ."). However, such analysis is not necessary because we have already concluded Brown's conviction must be vacated on other grounds.

SHWARTZ, Circuit Judge, concurring in part and dissenting in part.

I agree with my colleagues that the District Court properly denied the motion to suppress and that the Government's comments in its rebuttal summation concerning fingerprint evidence were improper. We part company, however, because even if the evidence of Brown's use of straw purchasers was improperly admitted,[1] I would nonetheless conclude that the error was harmless. Thus, I respectfully concur in part and dissent in part.

---

[1] Because I believe that any error in admitting the prior bad act evidence was harmless, I would not reach the closer question of whether admission of the evidence violates Fed. R. Evid. 404(b). I note, however, that Rule 404(b)(2) does not bar all evidence that could also lead to an inference of propensity. If it did, then the cautionary instruction that trial courts must deliver upon request under Huddleston v. United States, 485 U.S. 681, 691-92 (1988), to ensure that that the evidence is not used for an improper propensity purpose would be unnecessary. In this case, even though the evidence could demonstrate a propensity for using others to buy guns for Brown, I believe the evidence had a proper purpose under Rule 404(b)(2)—namely, to refute Brown's defense that his girlfriend purchased the gun for herself and that he did not know she left it in the car, and thereby show Brown knew of the gun's presence in the car and that it was not there by mistake. Cf. United States v. Moorehead, 57 F.3d 875, 878 (9th Cir. 1995) (permissible admitting testimony that a witness observed the defendant with the same gun in the past to rebut a defense witness's claim that she placed the gun under the seat).

This Court has held that "[w]here evidence is improperly admitted, reversal is not required where it is highly probable that the error did not contribute to the judgment." United States v. Berrios, 676 F.3d 118, 131 (3d Cir. 2012) (quotation marks omitted); United States v. Cunningham, 694 F.3d 372, 392 (3d Cir. 2012) (an error is deemed harmless unless the Court has a "sure conviction that the error did not prejudice the defendant" (quotation marks omitted)). When measured against the evidence presented, I would conclude that it is highly probable that any error did not contribute to the judgment.

First, four detectives testified that they saw Brown in his car, reach in the area of his waistband, and then move in a way consistent with reaching under his seat. Second, the gun was found partly tucked under that seat. While the gun may not have been seen in Brown's hand, Maj. Op. at 29, it was precisely where the detectives saw him reach. Third, the gun was visible to those outside of the car and hence was very likely visible to one seated inside it. Fourth, the prior bad act evidence, which involved conduct different from the conduct charged, was admitted in a short statement and offered in a very sanitized way.[2] The jury was not exposed to any of the details that the Majority describes regarding Brown's statement to the Bureau of Alcohol, Tobacco, Firearms, and Explosives about his arrangement to use one of his drug

---

[2] I agree with my colleagues that packaging evidence in a stipulation does not immunize it from the careful weighing that we require under Fed. R. Evid. 403, but we should nonetheless examine how the evidence was presented, used, and compared with the other evidence offered when conducting a harmless error analysis.

customers to buy him guns in exchange for drugs. Rather, the jury was told only that "the defendant acknowledges using straw purchasers/third parties to purchase firearms for him in the past." App. 683. Fifth, the limited evidence that the jury heard was presented only because of, and to refute, Brown's defense[3] and it was not harped on, as it was mentioned only once during closing argument. Cf. United States v. Smith 725 F.3d 340, 344 (3d Cir. 2013) (noting that the Government repeatedly referred to the defendant's prior bad acts in summation). Thus, the evidence in this constructive possession case was strong and it is highly probable that the single reference to Brown's prior use of others to purchase firearms for him did not contribute to the judgment. As the prior bad act evidence did not prejudice Brown, the admission of the evidence was harmless and I would therefore affirm the judgment.[4]

Accordingly, I respectfully concur in part and dissent in part.

---

[3] Furthermore, the prior use of straw purchasers was not the Government's only method of impeaching Brown's girlfriend. On cross-examination, the Government elicited that she had not been truthful about her employment on her gun permit, she was not familiar with guns, and she had told Brown's probation officer she did not own a gun.

[4] The Government's improper comments during summation do not change the result, in light of the strong evidence of Brown's guilt and the District Court's nearly contemporaneous instruction that the summations were merely argument that the jury could not treat as evidence.