**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2997
_____

UNITED STATES OF AMERICA

v.

JOMAR IVORY,
Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 3-21-cr-00136-001)
District Judge:  Honorable Malachy E. Mannion

_____

Argued:  July 14, 2023

Before:  PHIPPS, MONTGOMERY-REEVES, and McKEE, *Circuit Judges*.

(Filed: August 12, 2024)

Sean A. Camoni
OFFICE OF UNITED STATES ATTORNEY
235 N Washington Avenue
P.O. Box 309, Suite 311
Scranton, PA 18503

Christian T. Haugsby          **[ARGUED]**
OFFICE OF UNITED STATES ATTORNEY
MIDDLE DISTRICT OF PENNSYLVANIA
Sylvia H. Rambo United States Courthouse
1501 N 6th Street, 2nd Floor
P.O. Box 202
Harrisburg, PA 17102

*Counsel for United States of America*

Jason F. Ullman     [ARGUED]
OFFICE OF FEDERAL PUBLIC DEFENDER
100 Chestnut Street
Suite 306
Harrisburg, PA 17101

     *Counsel for Jomar Ivory*

_____

OPINION[*]

_____

PER CURIAM

In early April 2021, while incarcerated at United States Penitentiary Canaan, in Waymart, Pennsylvania, Jomar Ivory, during a recorded telephone call with his sister, expressed his frustration at the prospect of being subjected to another 21-day COVID lockdown. He relayed his opinion that such treatment violated his Fifth Amendment rights and stated his intention to resist in protest by forcing the prison guards to restrain him. He also explained that if the surveillance cameras recorded the guards using excessive force on him, he would sue and prevail. Less than an hour later, Ivory attracted the attention of the guards by acting erratically, and he attempted to punch one of them. Shortly before midnight that same day, still frustrated, Ivory appeared non-responsive and stayed limp when officers tried to lift him off the floor before he became agitated and attempted to bite an officer assisting with a medical examination. Those acts of aggression, which never actually harmed any member of the prison staff, nonetheless resulted in Ivory being charged with two federal misdemeanors and receiving an additional 18-month prison sentence.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Ivory now challenges only an evidentiary issue associated with his conviction – the admission of a portion of the recorded telephone call with his sister in which he stated his intention to induce the prison guards to restrain him on camera and to sue them later for doing so. For the reasons below, any error in admitting that recording or the written transcript of that call was harmless, so we will affirm his conviction.

## BACKGROUND

The key events related to Ivory's evidentiary challenge occurred at USP-Canaan on April 9, 2021.

At 9:02 a.m., Ivory placed a telephone call to his sister. He had just been released from COVID quarantine in the Special Housing Unit, and he learned that before his scheduled release from prison on May 21, he would have to undergo another 21-day COVID lockdown as an unvaccinated inmate. During this nearly ten-minute conversation, he explained his belief that such a lockdown violated his Fifth Amendment rights, and that he planned to make the prison guards restrain him on camera before he would go to lockdown. He anticipated that they would have to use force, and so he explained that he would use those recordings as evidence in a future tort claim against the guards.

Shortly after the call and a little before 10:00 a.m., Ivory began to act erratically. He mumbled incoherently and did not respond to questions from corrections officers. On the suspicion that Ivory was under the influence of narcotics, they escorted him to a lieutenant's office for a urinalysis test. Once inside the bathroom, where there were no surveillance cameras, Ivory closed his fist and attempted to punch one of the officers. The officers restrained him and called for back-up and a paramedic to assess Ivory's injuries. After Ivory denied being injured, he was placed in the Special Housing Unit for continued observation.

3

Throughout the day, prison staff entered Ivory's cell to speak with him, to check his restraints, and to evaluate his medical condition. As recorded on the observation log in roughly two-hour increments, Ivory continued to behave aggressively throughout the day. He yelled expletives, refused to answer questions, and threw a mattress and blanket on the floor.

Just before midnight, the on-duty lieutenant observed that Ivory was on the ground and unresponsive. The lieutenant requested medical assistance and additional staff, and upon their arrival, he entered the cell with six other staff members. After lifting Ivory up and seating him on the concrete bed, the lieutenant reached under Ivory's chin to lift his head for the paramedic to better assess him. Ivory then attempted to bite the lieutenant's hand. Staff members quickly forced Ivory flat on the concrete bed and placed him in four-point restraints prostrate on the slab.

## PROCEDURAL HISTORY

Based on these events, the United States charged Ivory through criminal information with two counts of misdemeanor assaulting, resisting, or impeding federal officers under 18 U.S.C. § 111(a)(1). Ivory retained his right to a jury trial but proceeded before a Magistrate Judge. *See id.* § 3401(b) ("Any person charged with a misdemeanor, other than a petty offense may elect . . . to be tried before a district judge for the district in which the offense was committed."); *see also id.* § 3231 (conferring original jurisdiction on district courts for "all offenses against the laws of the United States").

Before trial, Ivory, through counsel, raised substantive and procedural objections to the admission of the recording of his telephone call with his sister on Federal Rule of Evidence 404(b) grounds. He argued that the recording was inadmissible other-acts evidence under Rule 404(b) because it impermissibly impugned his character by showing

4

that he intended to resist officers – the crime with which he was charged – as part of a plan to generate a tort action for monetary gain.  Ivory also challenged the admission of the recording on the procedural grounds that the Government did not provide him with the notice required by the Rule.  *See* Fed. R. Evid. 404(b)(3).

The Magistrate Judge rejected those arguments.  On the substance, she concluded that the recording was intrinsic evidence that directly proved Ivory's intent to forcibly assault or resist the officers and thus, the recording was not subject to Rule 404(b).  *See United States v. Schneider*, 801 F.3d 186, 201 (3d Cir. 2015).  That ruling obviated Ivory's procedural challenge: since the recording was not offered as character evidence, no notice was required.

The case then proceeded to trial.  The Government relied on testimony from seven members of the prison staff, and it also played the recorded telephone call.  Ivory testified in his own defense, and he re-called as a witness one member of the prison staff.  The jury convicted Ivory on both counts, and the Magistrate Judge sentenced Ivory to 18 months in prison – nine months for each count.

After an unsuccessful appeal to the District Court for the Middle District of Pennsylvania, *see* 18 U.S.C § 3402, and an extension of the deadline for a further appeal, Ivory filed a notice of appeal, bringing the matter within this Court's appellate jurisdiction.  *See* 28 U.S.C. § 1291.

## DISCUSSION

On appeal, Ivory argues primarily that the recording of the telephone call was not intrinsic to the crimes charged and thus was used in violation of Rule 404(b) to prove his character for violence and to make propensity inferences that he acted in conformity with that character.  *See* Fed. R. Evid. 404(b)(1).  Secondarily, Ivory contends that even if that

5

were a permissible use of the phone recording as other-acts evidence, the Government did not provide the requisite notice of its intention to offer other-acts evidence.

But even if Ivory's recorded statement about seeking to induce the use of force and sue was subject to exclusion under Rule 404(b), its admission was harmless. That is so because without that statement, the trial record still contains abundant evidence to support Ivory's conviction for these two counts of "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], or interfere[ing] with [Federal Bureau of Prisons officers] while engaged in or on account of the performance of official duties . . . ." 18 U.S.C. § 111(a)(1).[1] And the strength of that evidence makes it highly probable that a reasonable jury would reach the same result even without the recorded phone call. *See United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016); *see also United States v. Cross*, 308 F.3d 308, 326 (3d Cir. 2002) ("Under the 'highly probable' standard, however, '[t]here is no need to disprove every reasonable possibility of prejudice.'" (alteration in original) (quoting *United States v. Copple*, 24 F.3d 535, 546 (3d Cir. 1994))).[2]

---

[1] The Dissenting Opinion asserts that the error was not harmless, and it relies upon two cases for that proposition: *United States v. Brown*, 765 F.3d 278 (3d Cir. 2014), and *United States v. Caldwell*, 760 F.3d 267 (3d Cir. 2014). But the harmless error doctrine does not apply categorically: evidence that may be prejudicial in one case may be harmless in another. That is so because the analysis of harmless error involves a comparison of the erroneously admitted evidence to the overall strength of the government's evidence. And the two cases that the Dissenting Opinion cites are not apt comparators because they involved different evidence (prior convictions for gun crimes) that was more central to the government's proof in each instance. *See Brown*, 765 F.3d at 295 (explaining the error was not harmless because the government "failed to present anyone who could put the firearm in [defendant's] hands" and its own witness "testified that she placed the gun under the seat without [defendant's] knowledge"); *Caldwell*, 760 F.3d at 285 (determining the error was not harmless because the defendant testified he had a cell phone and not a gun, introduced corroborating witness testimony, and introduced other evidence to show that the gun belonged to someone else).

[2] Ivory's briefing alludes to several other statements on the recording that he characterizes as prejudicial. Those are his statements that he hoped to open a marijuana dispensary when Kansas legalized the drug; that his mother did not want him to parole to her home; and that his sister was equally hesitant to have him stay at her house due to her concern that he would get involved with drugs. The Dissenting Opinion embraces the characterization of

*The First Assault*

Ivory's first conviction is amply supported by eyewitness testimony, contemporaneous reports prepared separately by those eyewitnesses, and an investigatory report.

Two correctional officers who were in the restroom when Ivory provided the urine sample testified that he attempted to forcibly assault an officer. The first, Acting Lieutenant Billy Fox, testified that as soon as Ivory's restraints were removed, he "tried to strike [Officer Ryan Swartzfager] with a closed fist." Trial Tr. 101:7–8 (July 28, 2021) (JA65). Officer Fox further recounted that, even after Officer Swartzfager took Ivory to the ground and placed him in restraints, Ivory kept resisting. The second eyewitness was the intended victim of the attempted assault, Officer Swartzfager. He testified that, when he approached Ivory with the urinalysis cup, Ivory "balled up his right fist and swung at [him], missed, then, [Officer Swartzfager] and Officer Fox placed [Ivory] on the ground to regain control." Trial Tr. 45:20–21 (July 28, 2021) (JA84).

In addition to their trial testimony, both officers independently submitted reports on the day of the incident. Those reports, which were shown to the jury, recounted the same version of events and did so without consulting one another.

The investigatory report, prepared separately by another officer, also aligns with that version of the events. So too does the video of the debriefing. And both of these were made available to the jury.

those statements as prejudicial, but Ivory did not object on Rule 403 grounds to those statements in the District Court. He does not raise the controlling standard of review for unpreserved errors, which is plain error, much less how he satisfies even the first of its requirements, which would demand proof that the District Court abused its discretion in admitting those statements. *See United States v. Green*, 617 F.3d 233, 252 (3d Cir. 2010) ("We review [this part of the analysis] for abuse of discretion, which means we must uphold the District Court unless its ruling was 'arbitrary or irrational.'" (quoting *United States v. Universal Rehab. Servs. (PA) Inc.*, 205 F.3d 657, 665 (3d Cir. 2000))). Those allusions, therefore, do not rise to the level of an argument for vacating Ivory's conviction.

Thus, the record on appeal makes it highly probable that a jury would find Ivory guilty of a violation of 18 U.S.C. § 111(a)(1) for attempting to punch Officer Swartzfager – even without the statement that Ivory intended to induce an officer to injure him as a means of suing and recovery money.

***The Second Assault***

A similarly strong factual basis exists for the second assault conviction, again, even without the challenged statement from the recorded phone call. An eyewitness, Lieutenant Brian Paviglianti, testified that he "reached under Inmate Ivory's chin to lift his head up in order for Medical to get a look at him, . . . and at that point, [Ivory] showed his teeth and took a bite, a chomping action towards [his] hand." Trial Tr. 105:10–13 (July 28, 2021) (JA99). The video recording also shows the lieutenant rapidly recoiling his hand from Ivory's mouth and repeatedly shaking it – which certainly allows a reasonable inference that Ivory made a bite attempt. The lieutenant's contemporaneous reports confirm that Ivory attempted to bite him. The video of the debriefing of the officers shortly after the incident provides similar details.

Because these accounts from various sources are coherent and persuasive, it is highly probable that the recorded phone call and written transcript of that call did not contribute to the judgment.[3] If it had not been admitted, the jury's verdict would likely have been the same. Accordingly, any error associated with the admission of the statement from the recording was harmless.

---

[3] The Dissenting Opinion discounts the force of this evidence for three reasons: five other officers were in the room and none of them testified about the bite; the paramedic who was examining Ivory's legs at the time did not see the bite; and no biting or chomping motion is visible on the video. But from the video, it is apparent that not every officer was in a position to see a bite attempt. Similarly, although Ivory's mouth is not visible at that point in the recording, the video shows the officer place his hand near Ivory's face and quickly recoil it – clear circumstantial evidence of a bite attempt.

8

\* \* \*

For these reasons, we will affirm the judgment of conviction.

\* \* \*

*United States of America v. Ivory*, No. 22-2997
PHIPPS, *Circuit Judge*, concurring.

I join the per curiam opinion in full but write separately to point out that the recorded telephone call between Jomar Ivory and his sister is not, as a matter of law, subject to Rule 404(b).

Implicit in Ivory's challenge to the admission of the recorded statement expressing his plan to resist arrest to manufacture a tort claim is the assumption that Rule 404(b) applies. But there is a longstanding evidentiary distinction between statements of future intention, on the one hand, and prior crimes, wrongs, or other acts, on the other hand. For the reasons below, Ivory's recorded statement is one of future intention and not a prior crime, wrong, or other act requiring a Rule 404(b) analysis.

Statements of future intention are deemed very reliable, and there is no propensity bar associated with their use. As far back as the nineteenth century, the Supreme Court approved the inference that a declarant will act in conformity with a statement of future intention – even when the statement was otherwise hearsay. *See Mut. Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295 (1892). Indeed, the later promulgated Federal Rules of Evidence expressly allow statements of future intention as an exception to the rule excluding hearsay. *See* Fed. R. Evid. 803(3). And applying those rules, this Court has affirmed the introduction of a hearsay statement of future intention to prove conduct in conformity with that statement. *See United States v. Donley*, 878 F.2d 735, 737–39 (3d Cir. 1989), *cert. denied, sub nom. Donley v. United States*, 494 U.S. 1058 (1990).

By contrast, Rule 404(b) contains a propensity bar. Under that rule, evidence of prior crimes, wrongs, or other acts may not be used to prove character and then action in conformity with that character. Fed. R. Evid. 404(b)(1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a

particular occasion the person acted in accordance with the character."). So, if Ivory's statement qualifies as a prior crime, wrong, or other act, then the Rule 404(b) analysis would be required. *See generally Huddleston v. United States*, 485 U.S. 681, 691–92 (1988) (articulating four considerations for the Rule 404(b) analysis); *United States v. Caldwell*, 760 F.3d 267, 277–78 (3d Cir. 2014) (same). But if Ivory's statement that he intended to have the prison guards restrain him to generate a tort claim against them constitutes a statement of future intention, then it is not a prior crime, wrong, or other act subject to Rule 404(b).

Here, Ivory's statement that he would make the prison guards restrain him on camera is a statement of future intention. It states his future plan to engage in a confrontation with the prison guards and is akin to other recognized statements of future intention. *See, e.g.*, *Donley*, 878 F.2d at 737–38 (admitting hearsay statements of the victim to show her plan to separate from the defendant); *United States v. Tokars*, 95 F.3d 1520, 1535 (11th Cir. 1996) (similar), *cert. denied, sub nom. Tokars v. United States*, 520 U.S. 1151 (1997); *United States v. Hyles*, 521 F.3d 946, 959 (8th Cir. 2008) (admitting the statement of a co-conspirator to show his intent to take an act in furtherance of a conspiracy).

By contrast, neither the statement nor the recorded telephone call in its entirety fit within Rule 404(b). The statement is not itself a prior crime, wrong, or other act because it is not a verbal act, such as a threat, blackmail, a criminal solicitation, or an agreement to enter a conspiracy. *C.f., e.g., United States v. Green*, 617 F.3d 233, 249–52 (3d Cir. 2010) (analyzing a defendant's statement threatening an officer as an act for purposes of Rule 404(b)). Likewise, the telephone call is not a prior crime, wrong, or other act. Similarly, neither the statement nor the phone call constitutes evidence that Ivory had

2

committed a prior crime, wrong, or other act. *See, e.g.*, *United States v. Oberle*, 136 F.3d 1414, 1419 (10th Cir. 1998) (analyzing a defendant's statement to a police officer that "robberies were his MO" under Rule 404(b)).

In short, Ivory's expression of his plan to induce the prison guards to injure him on camera is a statement of future intention outside the reach of both the propensity bar and the notice requirement of Rule 404(b). Accordingly, Rule 404(b) does not prohibit the admission of that recorded statement as relevant evidence that Ivory intended to confront the guards and that he acted on that intention.

*United States of America v. Jomar Ivory*, No. 22-2997

McKEE, *Circuit Judge*, dissenting.

I find the circumstances of this case far too troubling to conclude that admission of the phone call was harmless. My colleagues disregard the extremely prejudicial nature of the call, downplay the crucial role it served at trial, and overstate the strength of the evidence against Ivory. During the phone call, the jury learned that neither Ivory's mother nor sister wanted him living with her; his sister worried Ivory would bring drugs into her home; and Ivory hoped to open a marijuana dispensary.[1] Given this information, as well as Ivory's discussion of his plan to sue for injuries he believed would inevitably result from the officers' forcible response to his COVID-quarantine resistance, the jury may well have impermissibly concluded that Ivory was the type of person who would commit the charged offenses. This trial turned on the credibility of the witnesses. Evidence of Ivory's guilt is not sufficiently strong for me to conclude that the verdict would have been the same had the jury's ability to assess Ivory's testimony not been besmirched by admission of the phone call. For these reasons, I dissent.

---

[1] My colleagues make much of the fact that Ivory did not object to these statements based on Federal Rule of Evidence 403, which provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ivory argued, however, that these portions of the call are not relevant. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Thus, Ivory had no need to rely on Rule 403 to object to the admission of this blatantly irrelevant evidence, which would have been excluded but for the Magistrate Judge's decision to admit the entire phone call as intrinsic evidence.

1

The Majority concludes that the trial record "contains abundant evidence to support Ivory's conviction" and that it is "highly probable that a reasonable jury would reach the same result even without the recorded phone call."[2] However, "[w]e [can] find such a high probability only when we have a 'sure conviction' that the error did not unfairly prejudice the defendant."[3] I am not so convinced.

The case against Ivory rested almost entirely upon the testimony of a few prison staff members. My colleagues observe that "[t]he Government relied on testimony from seven members of the prison staff."[4] However, only two of those seven staff members testified to witnessing the first assault and only one staff member testified to witnessing the second assault. My colleagues also contend that ample evidence supports Ivory's convictions by highlighting the following additional evidence: the contemporaneous reports prepared by those same eyewitnesses, a separate one paragraph "investigatory report" prepared by another staff member,[5] and a video debriefing of each incident. However, like the eyewitness testimony, this evidence is based solely on the recollections and veracity of the few staff members who witnessed the assaults. Therefore, this evidence provides minimal added evidentiary value. The only other evidence that does not depend on the credibility of the corrections officials is the video recording of the second assault. While a surveillance camera captured that entire incident on video, no

---

[2] Maj. Op. 7–8.
[3] *United States v. Brown*, 765 F.3d 278, 295 (3d Cir. 2014) (quoting *United States v. Cunningham*, 694 F.3d 372, 392 (3d Cir. 2012)).
[4] Maj. Op. 6.
[5] While the Majority refers to this one paragraph document as an "investigatory report," Maj. Op. 10, it is actually labelled, "Memorandum for Investigating Official," App. 155.

biting or chomping motion is visible in the footage.[6] Additionally, notwithstanding that seven staff members were in the cell when the alleged bite occurred, only the staff member who was the purported target of the charged assault testified that Ivory attempted to bite him. The paramedic *who was standing directly in front of Ivory* and examining him when the attempted bite allegedly occurred, testified that he did not see the incident. This evidence is not so overwhelming that the prejudicial impact of the phone call (which included Ivory's own mother's rejection of him) can be viewed as harmless.

Furthermore, while the Majority notes that Ivory testified in his own defense, it fails to mention that Ivory denied attempting to strike or bite any officer. The jury was, of course, free to reject his testimony as not credible. The fact that the jurors apparently did so should not be surprising since they knew that neither Ivory's sister nor his own mother trusted Ivory enough to let him live in her home. And jurors had reason to think he was the "type" of inmate who would scheme to win a lawsuit after he intentionally created the conditions to sue by resisting quarantine.

I therefore don't think it possible to possess a sure conviction that the jury's verdict would have been the same even absent admission of the unredacted transcript. The phone call permeated every aspect of the trial. It was the first thing the Government mentioned during its opening and the last thing it mentioned during its closing. Twice during a three-day trial, the jury listened to the *entire* recording of the phone call, including the extremely prejudicial information about Ivory's scheme to sue, his family

---

[6] While no biting or chomping is visible, the officer who testified that Ivory attempted to bite him appeared to pull his hand away and shake it several times.

members' refusal to let him live with them, his sister's fear he would bring drugs into her home, and his plans to open a marijuana dispensary. The phone call's central role at trial, its potential to prejudice the jury and result in impermissible propensity-based inferences, combined with the lack of overwhelming evidence against Ivory, should give us pause before we dismiss the phone call's impact on the trial.

Indeed, the fact that the unredacted transcript established Ivory's bad character was certainly not lost on appellate counsel for the Government. Quite tellingly, he even asserted during oral argument, "I think it's a reasonable inference . . . that if an individual, an incarcerated individual, *particularly one like Mr. Ivory*" said he was "going to make [officers] restrain [him]" and "he intended to resist" that he intended to do so forcibly.[7] Whether this was an unintentional concession or merely a moment of candor about the importance of the unredacted transcript, we should not so cavalierly overlook appellate counsel's argument and his recognition that the transcript went directly to Ivory's character. His argument was a candid statement about the impact of this evidence and explains why the Government's case began and ended by focusing the jury's attention on it.

Moreover, Ivory offered a substantive defense to the charges. Defense counsel argued to the jury that officers used unjustified force on Ivory, including placing him in ambulatory and four-point restraints,[8] and then fabricated the alleged assaults to justify

[7] Tr. Oral Arg. 18–19 (emphasis added).
[8] An individual in ambulatory restraints "has a chain around their waist, commonly referred to as a belly chain, the hands are restrained through handcuffs, which are connected to the belly chain, and they have leg irons, which are, essentially, handcuffs

their use of force. In support of this theory, Ivory testified that he never attempted to bite or strike any officer. He also explained how, despite his compliance, the officers took him down to the ground twice while he was in the bathroom; the second time, they did so because he was rolling a ball of hair in his hand.

We have previously observed that an error admitting evidence is not harmless where the defendant also presents a defense.[9]

In *Caldwell*, the defendant was convicted of being a felon in possession of a firearm.[10] We held that the erroneous admission of two prior convictions for unlawful firearm possession was not harmless even though two detectives testified that they observed the defendant with the gun.[11] Because the defendant offered a substantive defense—that he held a cell phone rather than a gun—we could not conclude that "the erroneously admitted evidence was inconsequential to the verdict."[12]

In *Brown*, the defendant was also convicted of being a felon in possession of a firearm.[13] We similarly held that the erroneous admission of evidence that the defendant had previously used a straw purchaser to obtain guns was not harmless even though four detectives testified "that [the defendant] made furtive movements consistent with

---

around their ankles." App. 97. An individual in four-point restraints has "each appendage . . . restrained, so each individual leg and each individual arm is restrained in an outstretched position . . . to each corner of the bunk or bed." App. 97. Ivory was placed in ambulatory restraints after he attempted to strike an officer. He was then placed in four-point restraints after he attempted to bite another officer.

[9] *United States v. Caldwell*, 760 F.3d 267, 285 (3d. Cir. 2014); *Brown*, 765 F.3d at 295.

[10] 760 F.3d at 271.

[11] *Id.* at 271, 285.

[12] *Id.* at 285.

[13] *Brown*, 765 F.3d at 283.

concealing a firearm under the driver's seat."[14] Because the erroneously admitted evidence improperly "suggested to the jury that [the defendant] was a bad actor with a history of gun crimes" and a witness had testified in the defendant's defense that she placed the gun under the seat, we did not possess a "sure conviction" that the error did not impact the verdict.[15]

The evidence against Ivory is no more compelling than the evidence against the defendant was in *Caldwell* or *Brown*. It is inconceivable that the phone call did not prejudice jurors' views of Ivory and make it much more difficult to believe Ivory's version of events. In accordance with our precedents, we should hold that the admission of the phone call was not harmless because we do not possess a "sure conviction" that the phone call was inconsequential to the verdict.

Accordingly, I respectfully dissent from the Majority's decision to affirm Ivory's conviction and sentence.

---

[14] *Id.* at 295.
[15] *Id.*